584 F.2d 1003
 190 U.S.App.D.C. 22, 26 P.U.R.4th 312
 STATE OF NORTH CAROLINA and North Carolina Utilities
Commission, Petitioners,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Brooklyn Union Gas Company, Philadelphia Gas Works, Gas
Section, Georgia Municipal Ass'n, Washington Gas Light
Company, Transcontinental Gas Pipe Line Corp., Piedmont
Natural Gas Company, Inc., North Carolina Natural Gas Corp.,
Commissioners of Public Works of Greenwood, South Carolina,
Consolidated Edison Company of New York, Inc., Carolina
Pipeline Company Public Service Electric and Gas Company,
Delmarva Power and Light Company, Pennsylvania Gas and Water
Company, and North Penn Gas Company, Public Service
Commission of the State of New York, Philadelphia Electric
Company, American Textile Manufacturers Institute, Inc.,
Long Island Lighting Company, Owens-Illinois, Inc., Farmers
Chemical Association, Inc., General Motors Corporation,
South Carolina Public Service Commission, Columbia Gas
Transmission Corp., Owens-Corning Fiberglass Corp., Eastern
Shore Natural Gas Company, CNG Transmission Company, United
Cities Gas Company, Intervenors.
PIEDMONT NATURAL GAS COMPANY, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Carolina Pipeline Company et al., Intervenors.
ELIZABETHTOWN GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Delmarva Power & Light Company et al., Intervenors.
PUBLIC SERVICE COMPANY OF NORTH CAROLINA, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Carolina Pipeline Co. et al., Intervenors.
ATLANTA GAS LIGHT COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Piedmont Natural Gas Co., Inc., et al., Intervenors.
CONSOLIDATED EDISON COMPANY OF NEW YORK, INC., Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Transcontinental Gas Pipe Line Corp. et al., Intervenors.
SOUTH JERSEY GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent,
Pennsylvania Gas and Water Company and North Penn Gas
Company et al., Intervenors.
 Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019
and 77-1083.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 19, 1978.
Decided July 13, 1978.
As Amended Aug. 29, 1978.
Rehearing Denied Sept. 11, 1978.
 
 Morton L. Simons, Washington, D. C., with whom Barbara M. Simons, Washington, D. C., was on the brief, for petitioners in No. 76-2102.
 William I. Harkaway, Washington, D. C., for petitioner in No. 77-1019 and intervenors in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007 and 77-1083.
 John T. Miller, Washington, D. C., for petitioner in No. 76-2140.
 Melvin Richter, Dale A. Wright and Gregory Grady, Washington, D. C., were on the brief, for petitioner in No. 76-2130 and intervenors in Nos. 76-2102, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 F. Kent Burns, Raleigh, N. C., was on the brief, for petitioner in No. 76-2145.
 John E. Holtzinger, Jr., and Paul H. Keck, Washington, D. C., were on the brief, for petitioner in No. 77-1007.
 Frederick Moring, Washington, D. C., for petitioner in No. 77-1083.
 Edward W. Hengerer, Atty., Federal Energy Regulatory Commission, Washington, D. C., with whom Drexel D. Journey, Gen. Counsel, Robert W. Perdue, Deputy Gen. Counsel, Allan Abbott Tuttle, Sol. and Jon G. Lotis, Asst. Litigation Counsel, Washington, D. C., were on the brief, for respondent.
 
 
 1
 Joseph P. Stevens, Brooklyn, N. Y., with whom Barbara M. Gunther, Alvin Adelman, Brooklyn, N. Y., Edward S. Kirby, Newark, N. J., James R. Lacey, Arnold Fieldman and Susan A. Low, Washington, D. C., were on the brief, for intervenors, The Brooklyn Union Gas Company, et al. Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 2
 Richard A. Solomon, Washington, D. C., with whom Sheila S. Hollis, Washington, D. C., and Peter H. Schiff, Gen. Counsel, Public Service Commission of New York, Albany, N. Y., were on the brief, for intervenor P. S. C. of N.Y. in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007 and 77-1019.
 
 
 3
 Steven Schachman and Barry J. Hart, Philadelphia, Pa., were on the brief, for intervenor, Philadelphia Gas Works in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 4
 Thomas F. Ryan, Jr., Washington, D. C., William N. Bonner, Jr., Houston, Tex., and Robert G. Hardy, Washington, D. C., were on the brief, for intervenor, Transcontinental Gas Pipe Line Corp. in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 5
 Ronald D. Eastman and Lynda S. Mounts, Washington, D. C., were on the brief, for intervenor American Textile Manufacturers Institute, Inc., in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 6
 Robert C. Richard, Mineola, N. Y., was on the brief for intervenors, Long Island Lighting Company in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007 and 77-1019.
 
 
 7
 Edward J. Grenier, Jr., Richard P. Noland, Richard A. Oliver, Washington, D. C., Frazer F. Hilder and Julius Jay Hollis, Detroit, Mich., were on the brief, for intervenor, General Motors Corp., in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 8
 John D. Daly, Stephen J. Small and Giles D. H. Snyder, Charleston, W. Va., were on the brief, for intervenor, Columbia Gas Transmission Corp., in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 9
 Stephen H. Watts, II, Richmond, Va., was on the brief, for intervenor, CNG Transmission Company in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 10
 Daryal A. Myse and Dean George Hill, Washington, D. C., entered an appearance for intervenors, Gas Section, Georgia Municipal Ass'n in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 11
 Donald W. McCoy, Fayetteville, N. C., entered an appearance for intervenor, North Carolina Natural Gas Corp., in Nos. 76-2102, 76-2130 and 76-2145.
 
 
 12
 William B. Patrick, Jr., Greenwood, S. C., entered an appearance for intervenor, Commissioners of Public Works of Greenwood, South Carolina in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 13
 Robert G. Simon and Stanley Morley, Washington, D. C., entered appearances for intervenor, Carolina Pipeline Company in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 14
 John S. Schmid and Paul W. Fox, Washington, D. C., entered an appearance for intervenor Delmarva Power & Light Company in Nos. 76-2102, 76-2130, 76-2140 and 76-2145.
 
 
 15
 Reuben Goldberg and Michael D. Oldak, Washington, D. C., entered appearances for intervenors, Pennsylvania Gas and Water Co., et al., in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 16
 Eugene J. Bradley, Philadelphia, Pa., entered an appearance for intervenor, Philadelphia Electric Co., in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 17
 Keith R. McCrea, Washington, D. C., entered an appearance for intervenor, Owens-Illinois, Inc., in No. 76-2102.
 
 
 18
 Jack M. Irion, Shelbyville, Tenn., entered an appearance for intervenor, United Cities Gas Co. in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 19
 Nathan Kaminski, Jr., and Robert T. Bockman, Columbia, S. C., entered an appearance for intervenor, South Carolina Public Service Commission in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007, 77-1019 and 77-1083.
 
 
 20
 Stephen A. Herman, Washington, D. C., entered an appearance for intervenor, Farmers Chemical Ass'n, Inc., in Nos. 76-2102, 76-2130, 76-2140 and 76-2145.
 
 
 21
 Raymond D. Hurley, Washington, D. C., entered an appearance for intervenor Owens-Corning Fiberglass Corp., in Nos. 76-2102, 76-2130, 76-2140, 76-2145, 77-1007 and 77-1019.
 
 
 22
 C. Stephen Angle, Washington, D. C., entered an appearance for intervenor, Eastern Shore Natural Gas Co., in Nos. 76-2102, 76-2130, 76-2140, 76-2145 and 77-1007.
 
 
 23
 Michael J. Manning, Washington, D. C., entered an appearance for intervenor, Commission of Public Works for the City of Laurens, South Carolina, in Nos. 76-2130 and 76-2140.
 
 
 24
 Jerome Ackerman, Washington, D. C., entered an appearance for intervenor Stauffer Chemical Company in No. 77-1083.
 
 
 25
 Before ROBINSON, ROBB and WILKEY, Circuit Judges.
 
 
 26
 Opinion for the Court filed by WILKEY, Circuit Judge.
 
 WILKEY, Circuit Judge:
 
 27
 These consolidated cases are before this Court on petitions for review of Federal Energy Regulatory Commission ("Commission") orders prescribing a permanent natural gas curtailment plan for the Transcontinental Gas Pipe Line Corporation ("Transco"), an interstate natural gas pipeline.[1] Various aspects of the curtailment plan are challenged by a number of Transco's customers,[2] and by the State of North Carolina and the North Carolina Public Utilities Commission. Other customers have intervened in support of the plan. For reasons stated herein, we remand this case to the Commission for further proceedings not inconsistent with this decision.
 
 I. BACKGROUND
 A. "Pro Rata" and "End-Use" Curtailment
 
 28
 When a pipeline company's natural gas supplies become inadequate to meet contractual commitments to customers, there must be provision through a curtailment plan for apportioning the diminishing gas supply among the customers. There are essentially two basic approaches for allocating supplies in a period of shortage.
 
 
 29
 By the "pro rata" approach available supplies are allocated in proportion to each customer's firm, Commission-certificated contract entitlement from the pipeline. Under this approach the impact of the shortage is distributed evenly among the pipeline's customers in relation to prior contractual commitments.
 
 
 30
 By the "end-use" approach various uses of natural gas are ranked according to their essentiality or desirability, and allocation is first made to the highest priority use, then if supplies are sufficient, to the next highest use, and so on down the line until supplies are exhausted. Most pipeline customers are distributor companies which resell the gas to ultimate consumers; therefore, under the end-use approach, the extent to which a pipeline's distributor customers are curtailed depends on the "mix" of each distributor's own customers. Distributors who have a large percentage of high priority customers theoretically will not be curtailed as deeply as those who have a small percentage of such customers, and distributors who have a large percentage of low priority customers will be curtailed more sharply than those who have a small percentage of such customers. The object of an "end-use" plan is to ensure that higher priority uses are completely supplied before lower priority uses are served.
 
 
 31
 It is clear that a successful "end-use" plan must have two elements: first, a priority ranking of particular end uses from highest to lowest and, second, an allocation mechanism for assuring that higher-priority uses are protected from curtailment ahead of lower priority uses. The first of these elements is relatively easy to devise. It is only necessary to classify the various uses of natural gas and then to rank these uses in order of priority. The second element of an "end-use" plan the allocation mechanism designed to ensure high-priority use ahead of low-priority use is somewhat more difficult. The permanent curtailment plan challenged in this case is ostensibly an "end-use" plan, and the controversy focuses precisely on the effectiveness of the plan's allocation mechanism; opponents of the plan argue that its allocation scheme does not actually protect high priority uses ahead of low priority uses.
 
 
 32
 In 1970 natural gas shortages developed on a number of pipeline systems in the United States. In April 1971 the Federal Power Commission promulgated Order No. 431, a "Statement of General Policy,"[3] requiring every jurisdictional pipeline to report to the Commission whether curtailment of its deliveries to customers would be necessary because of inadequate supply of natural gas. A pipeline anticipating the necessity for curtailment was required to file a revised tariff to control deliveries to all customers under Section 4 of the Natural Gas Act. The Order hinted that curtailment should be based on the end use of the gas rather than on prior contractual commitments and stated that plans approved by the Commission "will control in all respects notwithstanding inconsistent provisions in (prior) sales contracts. . . ."[4] In response to Order No. 431, numerous pipeline companies submitted curtailment plans for Commission approval. The plans reflected a wide range of views as to the proper priorities for delivery. Some plans were based on end use; others, on contract entitlement.
 
 
 33
 Sensing a need for guidance in the curtailment area, the Commission issued Order No. 467[5] in January 1973. In essence the Order stated that it was the Commission's policy to require curtailments on the basis of the uses made of the gas (end uses) rather than on the basis of prior contractual commitments (pro rata), and it set forth nine priority-of-service categories based on end use. The Order required "full curtailment of the lower priority category volumes to be accomplished before curtailment of any higher priority volumes is commenced."[6] Highest priority was assigned to residential customers; large commercial users and various categories of industrial users completed the list. Since the Order purported to be a general policy statement rather than a rule of binding effect, the Commission declined to order pipelines to file conforming tariffs. At the same time, though, it stated that tariffs not in accord with its priorities would be subject to suspension and that "any curtailments under nonconforming tariff sheets which have not received Commission approval may be found to be unjust and unreasonable."[7]
 
 B. Curtailment on the Transco Pipeline
 
 34
 Transco is one of the major transmission systems in the United States engaged in the transportation and sale of natural gas in interstate commerce and, as such, is subject to regulation by the Commission under the Natural Gas Act.[8] Transco's pipeline system extends from its supply sources in Texas, Louisiana, Mississippi, and the offshore Gulf of Mexico area through the states of Alabama, Georgia, South Carolina, North Carolina, Virginia, Maryland, Pennsylvania, and New Jersey, to its termini in the New York Metropolitan area. The pipeline serves 81 customers. Of these, 80 are wholesale customers public utilities and municipalities which purchase the gas for resale to ultimate customers.
 
 
 35
 In 1971 Transco experienced gas supply shortages and commenced curtailment of service. The shortages are continuous, year-round and worsening. Curtailment levels have gone from 7.41% In 1972-1973 to 44% In 1976-1977.[9] From 1971 to 1976 curtailment on the system was governed by a series of short-term interim settlement agreements among Transco, its customers, and other interested parties. These interim settlements were, in some instances, approved by the Commission and, in other instances, mandated by orders of this Court.[10]
 
 
 36
 The first and second interim settlement agreements, which were in effect from November 1971 through November 1974, provided for pro rata curtailment of deliveries on the basis of contract entitlements and contained compensation mechanisms that allowed for reimbursement reimbursement of those customers curtailed more than the system-wide weighted average by those distributors curtailed less than the system-wide weighted average.
 
 
 37
 The third interim settlement agreement was in force from November 1974 through November 1975. The need for this plan resulted from an increased level of curtailment on the Transco system which endangered high-priority service. This interim agreement was designed to mitigate the danger to high-priority service by functioning basically on a 50 percent pro rata basis and 50 percent end-use basis. Like the two earlier agreements, this hybrid plan contained a compensation provision by which the least curtailed customers compensated the most curtailed customers.
 
 
 38
 The fourth and final interim settlement agreement was in effect from November 1975 to October 1976. In response to the fact that curtailment on the system had further deepened, this fourth plan was essentially a two-priority end-use plan. Unlike the three earlier interim plans, however, this settlement agreement did not contain a compensation mechanism.
 
 
 39
 During 1976 the parties once again conducted settlement discussions in an effort to work out an acceptable curtailment plan, but, unfortunately, this time a settlement was not achievable.
 
 
 40
 In the meantime, however, throughout the course of these various interim plans, hearings were held at the Commission on a Permanent curtailment plan. Transco had filed its first permanent curtailment proposal in May 1971 in response to FPC Order No. 431.[11] However, the Commission had terminated that docket when, by order of 15 November 1971,[12] it approved the first interim agreement. Approval was conditioned on Transco's submission of a New permanent curtailment plan by January 1972. Transco did submit the new permanent plan on schedule, and the Commission set it for hearings in Docket No. RP72-99. Then, at this point, the second interim agreement was arrived at by interested parties and approved by the Commission.[13] This settlement agreement required Transco to file a new curtailment plan with the Commission not later than 1 May 1973. On that date Transco Did not file a new curtailment plan but moved instead for an extension of the second interim agreement. By order of 23 May 1973 the Commission denied Transco's motion and directed the company to file by 1 July 1973 a curtailment plan in conformity with Order No. 467, the "Statement of Policy" calling for end-use plans which the Commission had issued in January 1973.[14] Pursuant to the Commission's direction, Transco filed a 467-type end-use curtailment plan on 29 June 1973. By order of 30 July 1976 the Commission suspended the 467-type plan and set the matter for hearing in Docket No. RP72-99. Hearings commenced in September 1973 and continued intermittently through 25 June 1974; the record was closed on 11 July 1974, and initial and reply briefs were filed on 1 and 25 November 1974 respectively.
 
 
 41
 At these hearings Transco presented witnesses explaining how a 467 plan would be implemented if the Commission directed that one be adopted for the Transco system. Transco's proposed implementation of the 467 plan was tied to a "base period" the twelve months from May 1972 through April 1973 for which period Transco had collected from each of its customers an analysis of sales based on the nine priority categories of Order No. 467; for customers served by more than one pipeline, Transco allocated each customer's resale market among the several pipelines on a proportionate basis reflecting base-period volumes provided by each pipeline. Transco further indicated that it proposed to curtail on a seasonal basis (I. e., derive a volumetric allocation for each customer for a 5-month winter period and separate volumetric allocation for the 7-month summer period), rather than on the monthly or daily basis followed by other pipelines, and it presented various studies showing the volumetric allocations that would result under the plan for each customer at various assumed levels of curtailment.
 
 
 42
 All of Transco's major customers presented witnesses to stand cross-examination on the base-period market data submitted by those customers to Transco. Testimony was also received on the financial adjustment (or "compensation") that would be necessary should the disparate curtailments caused by a 467 plan become effective. No testimony was presented by the Commission staff, and, with very limited exception, Transco's customers and affected State regulatory commissions offered no support for the 467 approach.
 
 
 43
 The Commission subsequently directed its staff to prepare a draft environmental impact statement and ordered further hearings and briefs on the environmental issue. A hearing on the environmental question was held in June 1976, and initial and reply briefs were filed during August 1976.
 
 
 44
 With the fourth interim curtailment agreement due to expire by its own terms on 31 October 1976 and with the parties unable to reach agreement on a new interim settlement agreement, the Commission cleared the way for expeditious consideration of a "permanent" curtailment plan for the Transco system, based upon the record evidence which had been accumulated over several years in Docket No. RP72-99. On 16 August 1976 the Commission granted a motion by its staff to omit the intermediate decision by the presiding hearing examiner and directed that the entire record be certified to the Commission for its decision in the first instance. To assist the Commission in prescribing a permanent plan, the 16 August order also permitted the filing of updated briefs in Docket No. RP72-99.
 
 C. Opinion Nos. 778 and 778-A
 
 45
 On 8 October 1976 the Commission issued Opinion 778, prescribing a permanent curtailment plan for the Transco system. The plan, basically a 467-type "end-use" plan, classifies end uses of natural gas into nine categories and ranks these categories according to priority:
 
 Priority 1:
 
 46
 Residential and small commercial;
 
 Priority 2:
 
 47
 Large commercial, essential industrial, and storage injections;
 
 Priority 3:
 
 48
 Non-essential industrial under 300 Mcf/d;
 
 Priorities 4 and 5:
 
 49
 Non-essential industrial other than boiler fuel, over 300 Mcf/d;
 
 Priorities 6-9:
 
 50
 Boiler fuel over 300 Mcf/d.
 
 
 51
 The plan then allocates Transco's current supply according to each customer's end use during the 12-month historical base period from May 1972 to April 1973. For those customers served by more than one pipeline, the base period end use is allocated between Transco and the customer's other pipeline suppliers in proportion to the supply provided by each pipeline during the 1972-1973 base period. Allocations are made on a seasonal basis one allocation for the five winter months, a second and separate allocation for the seven summer months rather than on a monthly or daily basis.
 
 
 52
 The Commission refused to consider inclusion in the plan of a compensation mechanism by which customers curtailed more than the system-wide average would be compensated by customers curtailed less than the system-wide average.
 
 
 53
 Timely applications for rehearing of Opinion No. 778 were filed by petitioners; on 8 December 1976 the Commission issued Order 778-A denying rehearing. These appeals followed.
 
 II. DISCUSSION
 
 54
 Petitioners challenge the permanent curtailment plan prescribed in Order 778 on numerous grounds. We conclude that two of these grounds have merit. First, we believe the Commission erred in failing to assess the actual impact of the plan on ultimate consumers. Second, we find that the Commission erred in failing to consider fully the issue of compensation. These two matters require a remand to the Commission for further consideration. On all other grounds raised by petitioners the Commission is affirmed.
 
 A. Actual Impact
 
 55
 Under the plan prescribed in Opinion 778, some of Transco's wholesale customers are curtailed significantly more than others. This disparity results from the fact that Transco's various wholesale customers serve different "mixes" of ultimate consumers. Some distributors, for example, serve major metropolitan areas, with heavy concentrations of residential and small commercial consumers, while others serve suburban and semi-rural communities, with low population densities. Some distributors serve heavily industrialized centers, while others serve areas with relatively little industry. Since, under the Opinion 778 plan, Transco's customers are curtailed according to the end use made of gas supplied during the 1972-1973 base period, distributors that served a large percentage of high-priority residential and small commercial users During that period are curtailed less sharply than distributors that served a lower percentage of such users, and distributors that served a high percentage of low-priority industrial customers During that period are curtailed more severely than distributors that served a lower percentage of such customers.
 
 
 56
 These disparities in treatment are in some cases quite pronounced. For example, a study[15] showed that if an Opinion 778-type plan had been implemented in 1974-1975 it would have resulted in levels of curtailment among Transco's distributors ranging from 9.6% To 39.5% On a state-by-state basis:
 
 
 57
 On a regional basis, curtailment levels would have ranged from 20.3% In the Northeast to 38.4% In the Southeast:
 
 
 58
 Zone 1 (Mississippi, Alabama, Georgia) 30.3%
 
 
 59
 Zone 2 (South Carolina, North Carolina,
 
 
 60
 Virginia) 38.4%
 
 
 61
 Zone 3 (District of Columbia, Maryland,
 
 Delaware, Pennsylvania, New
 
 62
 Jersey, New York) 20.3%
 
 
 63
 Significantly, the 39.5% Projected for North and South Carolina was more than 1.5 times the system-wide average curtailment. Also, North and South Carolina, together with Alabama, Georgia, and Virginia, were the only states with curtailment markedly above the system-wide average. On the other hand, a number of states would be curtailed well below the system-wide average. Moreover, the projected level of curtailment for Zone 2 as a whole was about 1.89 times that of Zone 3 and 1.31 times that of Zone 1.
 
 
 64
 These different levels of curtailment affect not only the distributor companies themselves but their ultimate consumers as well. While high-priority consumers still being served are in a better position than those who have been cut off and denied gas, these remaining consumers must bear a disproportionate financial burden. The natural gas industry is basically capital intensive and the disparate reductions in sales made necessary by an end-use allocation scheme result in a larger proportion of expensive excess capacity for those curtailed above the system-wide average than for those curtailed below the system-wide average. Since such excess capacity carries with it heavy financial obligations, distributors curtailed above the system-wide average must look to remaining consumers to make up the deficiency through payment of substantially higher rates. Thus, the customers of distributors curtailed above the system-wide average will be required to pay higher rates for pipeline gas than the customers of distributors curtailed under the system-wide average.
 
 
 65
 In affirming the Commission's curtailment authority over direct sales, the Supreme Court held in Federal Power Commission v. Louisiana Power & Light Co.[16] that curtailment plans are governed by the substantive standards set forth in § 4(b) of the Natural Gas Act. That section provides:
 
 
 66
 No natural-gas company shall, with respect to any transportation or sale of natural gas subject to the jurisdiction of the Commission, (1) make or grant any Undue preference or advantage to any person or subject any person to any undue prejudice or disadvantage, or (2) maintain any Unreasonable difference in rates, charges, service, facilities, or in any other respect, either as between localities or as between classes of service.[17]
 
 
 67
 There is no doubt that the curtailment plan prescribed in Opinion 778 is discriminatory. It confers distinct advantages to certain distributors and to the customers of those distributors. It discriminates against certain "localities" and certain "classes of service." However, § 4(b) does not prohibit discrimination Per se ; it prohibits "undue" and "unreasonable" discrimination. The issue thus presented is whether there is a reasonable basis for the disparate treatment accorded distributors and their customers under the Opinion 778 plan.
 
 
 68
 The Commission's position is that the discrimination that exists under the 778 plan is justified by the need for end-use allocation of diminishing natural gas supplies. It contends that end-use allocation is necessary to protect high-priority natural gas uses, that is, to ensure that lower-priority uses are curtailed ahead of higher-priority uses. In Order 778 the Commission states:
 
 
 69
 . . . (W)hile it is true that under the end-use plan Transco's resale customers would be curtailed differently than under pro rata curtailment of contract entitlements, This difference is not unduly preferential or discriminatory because we have found that end-use curtailment is necessary to protect the public interest.[18]
 
 
 70
 While end use is an appropriate consideration for purposes of curtailment,[19] Discrimination resulting from an end-use plan can be justified only to the extent that the plan actually does protect high-priority uses from curtailment ahead of low-priority uses.
 
 
 71
 We find that the Commission's conclusion that the Opinion 778 plan is just and reasonable Cannot be sustained in light of the Commission's failure to make findings as to the impact the plan would actually have on ultimate consumers. The fact of the matter is that the Commission does not know what impact the plan will have on ultimate consumers, and therefore it is not in a position to justify the discrimination resulting from the plan as necessary to achieve end-use objectives. Indeed, it is quite likely that the plan is an "end-use" plan in name only, and that, in fact, it allocates gas on a basis that Does not reasonably ensure the protection of high-priority end uses.
 
 
 72
 As already noted, any end-use plan must contain two essential components: a priority ranking of end uses from highest to lowest, and an allocation mechanism for assuring that higher-priority uses are protected from curtailment ahead of lower-priority uses. The priority rankings adopted by the Commission in Opinion 778 are not the problem here. Rather, it is the allocation mechanism chosen by the Commission that makes it difficult to assess the impact of this particular end-use system.
 
 
 73
 There are two defects in the plan's allocation mechanism. First, the plan allocates gas on the basis of stale base-period data that may not accurately reflect the true market profiles of Transco's customers. Second, the plan does not take into account the fact that some customers are totally dependent on Transco while others purchase substantial quantities from pipelines supplying much higher percentage of demands.
 
 
 74
 The distortions caused by the first of these defects are easy to perceive. The Opinion 778 plan allocates Transco's current supply on the basis of each customer's end use during an historical fixed-base period from May 1972 through April 1973. Since allocations of Transco's supply for, say, the summer of 1978 will be based on the end uses each customer was serving in the summer of 1972, it necessarily follows that the Opinion 778 plan will result in a true end-use allocation Only to the extent that each customer's 1978 end use in each priority category is identical with its 1972 end use. This manifestly is not the case, however. It is not only possible, it is Probable, that market profiles of Transco's customers have changed significantly over the past six years. It is likely that some of Transco's customers, particularly those in the Southeast, are serving a larger percentage of high-priority residential and small commercial customers today than they did six years ago. It is also likely that some of Transco's customers are serving a smaller percentage of such customers than they did six years ago. The result, then, of tying curtailment to stale market profiles is that pipeline gas may be taken from distributors already curtailing high-priority categories and diverted to distributors still serving lower priorities. This result is directly contrary to end-use principles.[2]
 
 
 75
 The second defect in the curtailment plan perhaps causes even more serious distortions. The vast majority of Transco's customers are served by more than one pipeline. In Consolidated Edison Co. of N.Y., Inc. v. F.P.C. (Consolidated Edison I)[21] this Court continued a stay in effect in order to prevent the Commission from imposing an end-use type plan on the Transco system even on an interim basis. One of our specific criticisms of the plan was that it failed to take into account the fact that some customers are wholly dependent on Transco while others have other pipeline sources. We now find this same defect carried over in the plan here under review. Under the 778 plan the base period end-use is allocated between Transco and the customer's other pipeline suppliers in proportion to the supply provided by each pipeline during the 1972-1973 base period. Since, under the 778 plan, allocations of Transco's supply for the current season will be based, for dually served customers, on Transco's 1972 share of each customer's end uses, it necessarily follows that the 778 plan will result in a true end-use allocation Only to the extent that it is assumed that Transco's supply has declined no more than that of the other pipeline suppliers. However, This assumption is demonstrably false, since, as the hearing examiner found in August 1975, "the Transco system represents the Commission's premier disaster area,"[22] and Transco's supply has continued to deteriorate sharply since. Thus, the exceedingly deep "end-use" curtailment under the 778 plan is cushioned for those customers having alternate suppliers, but falls with unmitigated harshness on customers who are wholly dependent upon Transco.
 
 
 76
 The anti-end-use vice inherent in the Commission's failure to take account of the fact that some of Transco's customers are served by more than one pipeline can be illustrated by the following hypothetical. Company A and Company B have identical requirements by priority. If Company A obtained half of its gas from Transco during the 1972-1973 base period and half from Pipeline X, Transco would be assigned half of each of Company A's priorities. If Transco curtailed at 40% And Pipeline X curtailed at 20%, Company A's curtailment would be 30% Of its total supply. If Company B were supplied entirely by Transco, it would be curtailed 40%. If the priority 1 and 2 requirements of each were 65% Of its total requirements, Company A would be able to supply all of its priority 1 and 2 needs and have 5% Of its total supply available for lower priorities. Company B, on the other hand, would have to curtail its priority 2 market by 5% Of its total supply (which may be substantially more than 5% Of just its priority 2 market). The effect then is that Company B must curtail a portion of its priority 2 market in order that Company A can sell inexpensive pipeline gas to its priority 3 market. Clearly in such a situation the whole concept of protecting high priority end users is violated.[23]
 
 
 77
 While any base-period curtailment plan will, by its very nature, produce results inconsistent with the end-use goals it is ostensibly designed to serve, this unhappy result is particularly true with the Opinion 778 plan on the Transco system. This is so because the customers having lower-than-system-average base period market profiles (e. g., the North Carolina companies) are precisely the customers solely dependent on Transco for their supply. Viewed from the opposite side, those customers having the highest profiles (and hence receiving more than their proportionate share from Transco) are the very customers who have alternate pipeline suppliers who are not curtailing as deeply as Transco.
 
 
 78
 Thus, an analysis of Transco's tariff sheets[24] filed 29 October 1976 pursuant to Opinion No. 778, reveals that, as compared with a straight pro rata plan, the Commission's plan will, during its first year of operation, take some 50 Bcf, mainly from North Carolina customers (30 Bcf) and Con Edison (10 Bcf), so that five customers may receive more than their proportionate share (Brooklyn Union, 19 Bcf; Public Service Electric & Gas, 10 Bcf; Long Island Lighting, 6.7 Bcf; Philadelphia Gas, 5.7 Bcf; and Washington Gas, 4.3 Bcf). But each of these five favored customers has two or three pipeline suppliers, and the Commission made no finding that, without the shift effected in the name of end use by the 778 plan, any of the five favored customers would have insufficient pipeline gas to serve high-priority uses which could be served by the disfavored customers absent the transfer.
 
 
 79
 When these facts were called to the Commission's attention[25] it simply shrugged the matter off as a "complex" problem requiring detailed "impact analysis" and suggested that it might, in the future, issue "a notice of proposed statement of policy."[26]
 
 
 80
 The Commission's failure to determine the impact of its order is not, as the Commission's actions seem to indicate, a matter that is optional, at the Commission's discretion. From the very beginning of the Natural Gas Act, the courts have held that it is Not the theory of a rate order But its impact that determines its legality.[27] Here, the Commission, entranced by the End-use theory of its order, has not come to terms with the Anti-end-use impact of its method of implementation.[28]
 
 
 81
 At oral argument counsel for the Commission flatly acknowledged that because of its use of stale base-period data and its failure to take alternative pipeline suppliers into account, the Commission simply did not know what kind of impact its plan would actually have on distributors and ultimate consumers. However, the only justification offered by the Commission for allocation of natural gas by Transco on a basis other than a pro rata curtailment is that some portion of the pipeline's supply is purportedly needed to serve a higher priority of customers. If gas is not actually required to serve these high priority customers, then the whole basis for curtailment evanesces. What the Commission has done is simply to Adopt a discriminatory curtailment plan and attempt to justify the plan on an end-use theory, when it Admittedly has no knowledge of the plan's impact on actual end use. The discrimination among customers that admittedly results from the Opinion 778 plan becomes "undue", within the statutory meaning, precisely because the Commission has not justified the discrimination as necessary to assure parity of treatment for equivalent end uses.
 
 
 82
 We remand the matter to the Commission. The Commission should, first, Determine, and, second, Consider the impact of its opinion on ultimate users in the implementation of a curtailment plan for the Transco system.
 
 B. Compensation
 
 83
 It is axiomatic that curtailment of supply and the consequent curtailment of sales it necessitates has an adverse financial impact on the curtailed distribution company and the consumers it serves; and the deeper the curtailment, the more severe the economic hardship. By adopting an end-use curtailment plan as the permanent method for allocating diminishing natural gas supplies along the pipeline, the Commission could not avoid allocating these hardships unequally among Transco's distributor customers. This court has previously recognized the hardships resulting from differing degrees of curtailment.[29] Concern over these disparate economic consequences is necessarily heightened in assessing the impact of a Permanent curtailment plan.
 
 
 84
 Compensation, by which customers curtailed less than the system average compensate those customers curtailed more than the system average, is one way to mitigate the disparate financial impact that results from end-use curtailment. When some customers are curtailed proportionately more than others, they effectively subsidize other customers. This subsidy represents a form of discrimination among pipeline customers. The function of compensation is not to eliminate this discrimination. Rather, through a compensation scheme, the Impact of disproportionately heavy curtailment is moderated.
 
 
 85
 Although compensation mechanisms have been used in interim curtailment plans,[30] for the past several years the Commission has taken the position that compensation is unlawful brokering of interstate entitlements among customers. The Fifth Circuit has twice rejected the Commission's position that it did not have the power to approve compensation proposals,[31] yet the Commission's opposition has continued, and, at the time Opinion 778 was decided, the compensation issue was pending before this Court in Transcontinental Gas Pipe Line Corp. v. FPC, 183 U.S.App.D.C. 145, 562 F.2d 664 (1976).
 
 
 86
 In considering the Opinion 778 plan, the Commission had before it a compensation provision proposed by Transco similar to the one employed in its second and third interim plans. Under the provision, customers being curtailed less than the Transco system average would pay $.25 per Mcf received in excess of the system average, and, conversely, customers being curtailed more than the system average would receive $.25 per Mcf curtailed in excess of the system average. Much evidence was adduced during hearings supporting compensation in principle, and there was evidence supporting various levels of compensation. Acknowledging that the compensation issue had "received substantial attention during the hearing,"[32] the Commission nevertheless rejected the proposal. It is clear that the reason the Commission failed to consider fully the compensation proposal was its continuing doubt over the legality of compensation in principle. It stated:
 
 
 87
 (I)n other pipeline proceedings (United and Florida Gas Transmission) the United States Court of Appeals for the Fifth Circuit has rejected the Commission's holding that compensation is beyond its jurisdiction. Nonetheless we will reserve our decision on this issue. The compensation question in RP72-99 is presently before the United States Court of Appeals for the District of Columbia Circuit in Transcontinental Gas Pipe Line Corporation v. FPC, No. 74-2036 (183 U.S.App.D.C. 145, 562 F.2d 664). In light of the present appellate posture on this case (the compensation issue has already been briefed and argued and is ripe for decision) any definitive resolution by the Commission at this stage appears to be inappropriate. Although the Supreme Court on October 4, 1976 denied the Commission's petition for certiorari (No. 75-1678) concerning Mississippi Public Service Commission v. FPC, (429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149) the Commission must fully analyze the legal implications of this Court action before proceeding.[33]
 
 
 88
 The Commission's doubts have now been resolved. In Elizabethtown Gas Company v. Federal Energy Regulatory Commission,[34] issued 26 January 1978, this Court held that the Commission does have the power to require compensation as part of a curtailment plan. In that case, petitioner Elizabethtown opposed two successive interim curtailment plans on the grounds that they failed to compensate customers of the Columbia pipeline which received less than their pro rata share of gas. The Commission approved the plans, rejecting Elizabethtown's claim on the ground that it lacked jurisdiction to order or approve a curtailment plan that included a compensation feature. Concluding that the Commission does have the power to require compensation, we remanded for a determination in appropriate proceedings whether and how this power should be exercised. We said:
 
 
 89
 The question of whether, and how, to provide compensation may well turn on the fairness of balancing the benefit accorded a high-priority purchaser with a charge that offsets, at least in part, the added expense imposed by a curtailment plan upon a lower-priority purchaser. We do not attempt to resolve this question on the present facts. We hold, merely, that it is open to the Commission to consider employing a compensation feature.
 
 
 90
 In order that the Commission may proceed, on the premise of legal authority, to consider whether and how a compensation feature should be or should have been included, we remand . . . .[35]
 
 
 91
 Because of the lasting discrimination inherent in an end-use permanent curtailment plan, the level of compensation accorded customers enduring heavier-than-average curtailment is a factor bearing on the reasonableness of the plan that the Commission must consider in prescribing a permanent curtailment plan. The Commission erred in failing to consider fully whether and how a compensation feature should have been included in the Opinion 778 plan. On remand, therefore, the Commission should explore the merits of the compensation issue on the basis of an adequate record.
 
 
 92
 In order to insure the orderly administration of gas curtailments, we do not vacate the Commission's orders in Opinion 778 and 778-A. The Commission may continue the plan in effect As an interim plan for a reasonable period of time pending its decision regarding the matters remanded for further consideration.
 
 
 93
 So ordered.
 
 
 
 [1]
 Transcontinental Gas Pipe Line Corp., Docket No. RP72-99; Opinion No. 778, Opinion and Order Establishing Permanent Curtailment Plan for Interstate Pipeline, --- F.P.C. ---, 16 P.U.R.4th 423 (issued 8 October 1976) (R. 13,731-13,816); and Opinion No. 778-A, Opinion and Order Granting in Part and Denying in Part Petitions for Rehearing, --- F.P.C. --- (issued 8 December 1976) (R. 14,242-14,270)
 
 
 [2]
 Petitions for review of Opinion Nos. 778 and 778-A and petitioners' briefs were filed with the Court by the State of North Carolina and North Carolina Utilities Commission in No. 76-2102, Piedmont Natural Gas Company in No. 76-2130, Elizabethtown Gas Company in No. 76-2140, Public Service Company of North Carolina in No. 76-2145, Atlanta Gas Light Company in No. 77-1007, Consolidated Edison Company of New York in No. 77-1019, and South Jersey Gas Company in No. 77-1083. Intervenor American Textile Manufacturers Institute filed a brief in support of petitioners
 
 
 [3]
 45 F.P.C. 570 (1971)
 
 
 [4]
 45 F.P.C. at 572
 
 
 [5]
 Statement of Policy, Utilization and Conservation of Natural Resources Natural Gas Act, Order No. 467, Docket No. R-469, 49 F.P.C. 85 (1973). Order No. 467 was subsequently clarified and amended in Order No. 467-A, 49 F.P.C. 217 (1973), and in Order No. 467-B, 49 F.P.C. 583 (1973). These orders will be referred to collectively as "Order No. 467."
 
 
 [6]
 49 F.P.C. at 87
 
 
 [7]
 Id. at 585
 
 
 [8]
 15 U.S.C. § 717 Et seq
 
 
 [9]
 R. 1546, 5752, 5753, 5755
 
 
 [10]
 See this Court's order issued 9 November 1973 in Consolidated Edison Co. of N. Y., Inc. v. FPC, No. 73-1399 (preserving status quo pending appeal) and Consolidated Edison Co. of N. Y., Inc. v. FPC, 167 U.S.App.D.C. 134, 511 F.2d 372 (1974). The tortuous history of curtailment on Transco is set forth in detail in Opinion 778 at --- F.P.C. ---, 16 P.U.R.4th 423 (1976)
 
 
 [11]
 See discussion at pages ---- - ---- of 190 U.S.App.D.C., at pages 1007-1008 of 584 F.2d
 
 
 [12]
 46 F.P.C. 1212 (1971)
 
 
 [13]
 48 F.P.C. 1060 (1972)
 
 
 [14]
 49 F.P.C. 1141 (1973)
 
 
 [15]
 R. 8161-8201
 Mississippi (1 customer) 9.6%
Alabama 30.7%
Georgia 30.3%
North and South Carolina 39.5%
Virginia 33.0%
District of Columbia 16.4%
Maryland-Delaware 24.0%
Pennsylvania 19.5%
New Jersey 21.7%
New York 19.4%
 
 
 [16]
 406 U.S. 621, 92 S.Ct. 1827, 32 L.Ed.2d 369 (1972)
 
 
 [17]
 15 U.S.C. § 717c(b) (emphasis added)
 
 
 [18]
 --- F.P.C. at ---, 16 P.U.R.4th at 453 (emphasis added)
 
 
 [19]
 See American Smelting & Refining Co. v. FPC, 161 U.S.App.D.C. 6, 494 F.2d 925 (1974)
 
 
 [20]
 We do not mean to suggest that end-use plans using fixed-base periods are unlawful per se. The point rather is this: Throughout these proceedings the Commission has contended that the discrimination resulting from its plan is not "undue" or "unreasonable" under Section 4(b) because it is necessary if high-priority uses are to be protected. However, the Opinion 778 plan is based on data that is six-years old. All that can be ascertained from this data is that if the plan had been adopted six years ago it might have been reasonably effective in protecting high-priority uses. The data tells us nothing about the plan's effectiveness in protecting high-priority uses now at the time of its adoption. End-use plans, whether employing fixed base periods or not, must be justified in terms of their effectiveness in achieving end-use objectives; this justification is possible in a particular case only if the actual end-use impact of a plan at the time of its adoption is known, and this knowledge in turn is dependent upon having relatively current data available
 
 
 [21]
 167 U.S.App.D.C. 134, 142, 511 F.2d 372, 380 (1974)
 
 
 [22]
 R. 6862B
 
 
 [23]
 We do not suggest that in order to pass muster under Section 4(b) a curtailment plan must Actually allocate supplies to partial-requirements customers in relation to the levels of curtailment on alternative pipelines. The point, rather, is this: To justify the discrimination caused by an end-use plan, the Commission must have a reasonably accurate assessment of the plan's ultimate impact on actual end use. Here, the Commission has failed to obtain an accurate projection of the plan's actual impact because it has not included in its calculations the distortions caused by the partial/full requirements phenomenon
 
 
 [24]
 R. 13,822-49
 
 
 [25]
 R. 14,031
 
 
 [26]
 R. 14,256-58. The Commission's steadfast refusal to evaluate the impact of its prescribed plan on the consuming public is all the more puzzling in view of its refusal to consider adding to the plan conditions on end use. Such conditions would appear to be the most direct and efficacious way to protect against the diversion of supplies from high-priority uses
 
 
 [27]
 FPC v. Hope Natural Gas Co., 320 U.S. 591, 64 S.Ct. 281, 88 L.Ed. 333 (1944)
 
 
 [28]
 The Commission contends that it has a sound reason for structuring the allocation mechanism in the way it has. It argues that if a permanent curtailment plan were to allocate gas supplies on Current market profiles (i. e., use a rolling base rather than a fixed base) and were to take into account supplies from other pipelines, then implementation of the plan would frustrate the Commission's collateral policies of (1) encouraging conservation; (2) discouraging load growth; and (3) stimulating supplemental supplies. We can understand why it May be desirable to accommodate an end-use plan to other important policies. But the time for this accommodation is After the Commission has determined and considered the actual impact that the ostensible "end-use" plan will have on ultimate consumers, since the end-use features of a plan can be justified only on the basis of actual impact. What the Commission, in effect, has done here, however, is to adopt a discriminatory plan that May or may not effectively protect high priority end use and then refuse to verify the effectiveness of the plan in the belief that to operate in ignorance of the plan's actual impact may further other important policies. This is not rational. Merely acquiring more information to determine the actual impact of the plan will not frustrate the Commission's conservation, supply-incentive policies. The practical effect of the Commission's actions is to convert what it has labeled an "end-use" plan into a conservation, supply-incentive plan; hence, the discriminatory end-use features of the plan become arbitrary because the conservation, supply-incentive policies can be achieved through a non-discriminatory plan
 
 
 [29]
 Rhode Island Consumers' Council v. FPC, 164 U.S.App.D.C. 134, 504 F.2d 203 (1974)
 
 
 [30]
 In ordering Transco's third interim agreement into effect, this court required that compensation dollars be collected and held in escrow pending ultimate judicial determination of the propriety of the Commission's rejection of the compensation provision. Consolidated Edison Co. v. FPC, 167 U.S.App.D.C. 134, 511 F.2d 372 (1974)
 
 
 [31]
 Fort Pierce Util. Authority v. FPC, 526 F.2d 993 (5th Cir. 1976); Mississippi Pub. Serv. Comm. v. FPC, 522 F.2d 1345 (5th Cir. 1975), Cert. denied, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976)
 
 
 [32]
 R. 13799; 16 P.U.R.4th at 466
 
 
 [33]
 Id. (emphasis added). Additionally, in both Opinion Nos. 778 (R. 13800) and 778-A (R. 14265-6), the Commission refers to an alleged inadequacy of the record evidence as a reason for its decision not to include compensation provisions in the curtailment plan. This assertion does not withstand analysis, however. The record contains the testimony of numerous witnesses attesting to the propriety of, the need for, and the appropriate levels of compensation. The Commission appears to rely on the fact that the evidence in the record does not reflect complete agreement among the parties as to the precise level of appropriate compensation. However, differences in opinion on the proper level of compensation do not justify the Commission's failure to consider whether or not Some compensation was appropriate. The determination to require compensation turns essentially on considerations of policy, not on the resolution of disputed facts, and the determination must be supported by sound reasoning. Here, there was No reasoning. It is clear that the Commission balked at considering compensation because it doubted its lawfulness in principle and not because it was baffled by conflicting views as to the appropriate level of compensation. Nor was it necessary at the outset to resolve finally and completely all conflicting evidence on the exact proper level of compensation. One party suggested that at a minimum the Commission should include compensation with proceeds to be held in escrow pending a determination of validity, a mechanism mandated by this Court in Con Ed. I. The Commission did not respond to this suggestion
 Moreover, in Opinion 778-A, the Commission rejected outright the compensation arrangements proposed (R. 14266), noting in this regard:
 Of course the proponents of compensation are always entitled under Section 5 of the Natural Gas Act to initiate a complaint proceeding against the absence of a compensation provision in Transco's permanent curtailment plan, of course bearing the burden of proof.
 We believe that the Section 5 remedy is not an adequate substitute for full Commission consideration of the compensation issue in the course of Section 4 proceedings on the curtailment plan itself. In FPC v. Louisiana Power & Light Co., 406 U.S. 621, 643-44, 92 S.Ct. 1827, 1840, 32 L.Ed.2d 369 (1972), the Supreme Court emphasized that while Section 5(a) was a procedural mechanism available to enforce the anti-discrimination provisions of Section 4(b) of the Natural Gas Act, a Section 4 proceeding was preferable:
 The § 5(a) procedure has substantial disadvantages, however, rendering it unsuitable for the evaluation of curtailment plans. The FPC must afford interested parties a full hearing on the reasonableness of the tariff before taking any remedial action, and, as we have observed, 'the delay incident to determination in § 5 proceedings through which initial certificated rates (as well as "practices" and "contracts") are reviewable appears nigh interminable.' Atlantic Refining Co. v. Public Service Comm'n, 360 U.S., (378) at 389, 79 S.Ct. 1246, 3 L.Ed.2d 1312. In addition a prescribed remedial order can have only prospective application. . . . (Footnote omitted).
 This court has expressed an "awareness that the effects of curtailment, even over the short term, can be irrevocable." Consolidated Edison Co. v. FPC, 168 U.S.App.D.C. 92 at 103, 512 F.2d 1332 at 1343. To run petitioners through a Section 5(a) proceeding, with its attendant delays, would simply mean a long period without remedy and provide a classic instance of justice denied through delay.
 
 
 [34]
 188 U.S.App.D.C. 4, 575 F.2d 885 (1978)
 
 
 [35]
 188 U.S.App.D.C. at 7, 575 F.2d at 888 (footnotes omitted)