BROWN, Circuit Judge,
concurring and dissenting:
While I agree with most of the majority’s conclusions,' I dissent from its holding that FERC satisfied the section 5 burden of showing the new rates it wants to impose on Transco are just and reasonable.
I
To accommodate the demands of its Cherokee customers, Transco increased its pipeline’s capacity by installing new compressors and then charging these customers to cover the construction costs. Transco then sought to continue its practice of charging all of its customers for the energy costs for running all compressors (including the new compressors), in proportion to each customer’s actual usage. After some of Transco’s mainline customers challenged these rates, FERC ordered Transco to make the Cherokee customers pay the same proportional rate as mainline customers for running the preexisting compressors and also pay the entire energy costs for running the Cherokee compressors. See Transcon. Gas Pipe Line Corp., 106 F.E.R.C. ¶ 61,299, 62,126 (2004); Resp’t’s Br. 9, 27. At the same time, the mainline customers would pay only their proportionate energy costs for running the preexisting compressors. Transco points out these new rates are illogical because its pipeline operates on an integrated basis, so all of its compressors serve all of its customers. Once new compressors are up and running, they push natural gas through the pipeline to all customers, and it makes no sense to attribute these compressors’ usage only to the Cherokee customers.
When a pipeline proposes new rates under NGA section 4, it has the burden of showing these rates are just and reasonable. Normally, if FERC rejects a section 4 rate change, this court simply defers to FERC’s rate-setting expertise. However, when FERC or intervenors seek to impose new rates under NGA section 5, they have the burden of showing the new rates are just and reasonable. See “Complex” Consol. Edison Co. of N.Y., Inc. v. FERC, 165 F.3d 992, 1000-01 (D.C.Cir.1999) (per curiam). “[T]his court has strictly policed the statutory line that separates” section 4 and section 5. Id. (emphasis added). Since this is a section 5 case, FERC has to show the rate-change proponents carried their burden of demonstrating the new rates are just and reasonable. In fulfilling this obligation, FERC has to do more than make mere “conclusionary statements”; it must “examine the cost-shifting effect of its order[ ].” See Algonquin Gas Transmission Co. v. FERC, 948 F.2d 1305, 1312, 1315 (D.C.Cir.1991). The panel majority fails to hold FERC to this obligation and thus undermines the distinction between section 4 and section 5.
II
As the majority concedes, FERC’s only explicit justification for the new rates is a “relatively unilluminating,” maj. op. 921, claim that Transco “ ‘can determine how much fuel or electric power is used to operate any particular compressor unit over a particular time,’ ” id. (quoting 106 F.E.R.C. ¶ 61,299 at 62,126). This is not *924 just unedifying; it is completely beside the point. No one doubts Transeo can determine the energy costs for running the Cherokee compressors. The question is whether FERC has shown it is just and reasonable for the Cherokee shippers to pay the full energy costs for operating these compressors, as well as paying their proportionate share for operating the preexisting compressors. This is a rather difficult task, as the Cherokee compressors serve both Cherokee and mainline customers. Far from meeting this challenge, FERC failed to grapple with the cost-shifting and pipeline efficiency impacts of its new rates.
By not “examin[ing] the cost-shifting effect of its order[ ],” FERC failed to satisfy the strictures of section 5. Algonquin Gas, 948 F.2d at 1315; see also North Carolina v. FERC, 584 F.2d 1003, 1012 (D.C.Cir.1978) (FERC cannot fail “to make findings as to the impact the plan would actually have on ultimate consumers” (emphasis omitted)). FERC’s only attempt to consider costs was its finding that under Transco’s preexisting rates, the annual electricity cost for running the Cherokee compressors was $2,380,399, while Cherokee customers paid only $135,151 in total energy charges. See 106 F.E.R.C. ¶ 61,-299 at 62,125. While these figures appear vaguely nefarious at first glance, they are largely a red herring, since FERC does not argue the Cherokee compressors primarily serve the Cherokee customers. More significantly, even if these numbers indict Transco’s preexisting rates, it was FERC’s duty to consider how the new rates would affect actual customers, and it completely failed to do so. Notably, the passages the majority cites to argue FERC considered the cost-shifting effect of the new rates focus exclusively on Tran-sco’s preexisting rates and say nary a word about the new rates. See Maj. op. 922.
If anything, FERC’s figures suggest the new rates will be grossly unfair and lead to reverse-subsidization. Under the preexisting rates, Transeo apparently charged Cherokee and mainline customers about $135,000 in energy costs for a particular amount of natural gas. Under the new rates, Transeo may have to charge the Cherokee customers roughly $2.5 million for the same amount of gas that non-Cherokee customers get for a mere $120,000.[1] While this represents only a rough guess about how the new rates could play out, it is notable that this is a plausible reading of the only figures FERC offers to defend these rates. Clearly, this is insufficient to satisfy FERC’s section 5 burden.
FERC also failed to consider the effects the new rates will have on the pipeline’s efficient operation. See Panhandle E. Pipe Line Co. v. FERC, 777 F.2d 739, 746 (D.C.Cir.1985) (FERC has “large authority to take action necessary to promote the purposes of the [Natural Gas] Act, including ... efficient service.”). To avoid grossly overcharging the Cherokee customers, Transeo may need to change from integrated operations focused on efficient provision of natural gas to rate-obsessed operations aimed at avoiding using the Cherokee compressors when serving mainline customers. As Transco’s expert explained, this later approach would make running the pipeline “grossly inefficient, [since] maintenance costs would increase *925 and reliability would be compromised [as] large turbines were cycled on and off to meet small changes in horsepower requirements as customers’ loads vary from hour to hour.” FERC does not grapple with this scenario or explain how it expects Transco to accommodate the new rates.
Ill
In an attempt to cure FERC’s deficient analysis, the panel majority speculates that the 1999 Policy Statement’s goal of not forcing mainline customers to subsidize capacity expansion could justify the new rates. See Maj. op. 921-22. Yet, FERC never explained why its concern about subsidization was the only consideration in determining whether the new rates in this case are just and reasonable. See Pac. Gas & Elec. Co. v. FERC, 506 F.2d 38, 38 (D.C.Cir.1974) (“When the agency applies [a policy statement] in a particular situation, it must be prepared to support the policy just as if the policy statement had never been issued.”).
Even more significantly, the Policy Statement was not concerned with energy costs — it was about ensuring that new customers pay for an expansion’s construction costs, something the Cherokee shippers have done. See Certification of New Interstate Natural Gas Pipeline Facilities, 88 F.E.R.C. ¶ 61,227 (1999), clarified, 90 F.E.R.C. ¶ 61,128 (2000). The majority may be correct that FERC’s authority to interpret this Policy was broad enough for it to conclude that Transco’s preexisting energy rates caused undesirable subsidization. See Maj. op. 925. However, this falls far short of satisfying FERC’s section 5 burden of proving the new rates are a just and reasonable method for dealing with this problem — especially in light of the practical differences between forcing expansion customers to pay energy costs, as opposed to construction costs. As this case shows, making expansion customers pay the full costs for powering new compressors may force the pipeline to operate in a grossly inefficient manner; no similar consequences flow from forcing them to pay construction costs. Similarly, charging expansion shippers the energy costs for running certain compressors on an integrated pipeline may cause more severe reverse-subsidization than billing them for discrete capital costs undertaken for their benefit. Nothing in either FERC’s 1999 Policy Statement or its orders in this case addresses these crucial distinctions.
In a section 5 case, FERC cannot simply declare the new rates are just and reasonable by relying on “conclusionary” references to a policy statement focused on a different issue, while ignoring how these rates will affect customers and the pipeline’s efficient operation. Algonquin Gas, 948 F.2d at 1312. After all, why is subsidization by existing customers more problematic than reverse-subsidization of existing customers?
IV
FERC’s disregard for the consequences of the new energy rates highlights its failure to take its section 5 burden seriously. I would grant Transco’s petition for review.

. $2.5 million is a combination of $2.38 million to run the Cherokee compressors and the $120,000 of proportional charges for running the preexisting compressors. Since $135,000 was the proportionate costs for running both the preexisting and Cherokee compressors, $120,000 is a rough estimate of the proportional energy costs for powering only the preexisting compressors.