636 F.2d 1328
 205 U.S.App.D.C. 200
 ELIZABETHTOWN GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Columbia Gas Transmission Corporation, Consolidated Edison
Company of New York, Inc., Philadelphia Gas Works, Brooklyn
Union Gas Company, Bay State Gas Company, et al., Algonquin
Gas Transmission Company, Consolidated Gas Supply
Corporation, Indiana Gas Company, Inc., United Cities Gas
Company, Somerset Gas Service of Somerset, Kentucky, Public
Service & Gas Company, Long Island Lighting Company, General
Motors Corporation, Public Service Commission of the State
of New York, Central Illinois Public Service Company,
Arkansas-Missouri Power Company, Associated Natural Gas
Company, Texas Gas Transmission Corporation, Municipal
Distributors Group, Texas Eastern Transmission Corporation,
Equitable Gas Company, and Philadelphia Electric Company,
Intervenors.
ELIZABETHTOWN GAS COMPANY, Petitioner,
v.
FEDERAL ENERGY REGULATORY COMMISSION, Respondent.
Consolidated Gas Supply Corporation, Brooklyn Union Gas
Company, Consolidated Edison Company of New York, Inc.,
Texas Eastern Transmission Corporation, Somerset Gas Service
of Somerset, Kentucky, Carnegie Natural Gas Company, Public
Service Electric and Gas Company, Bay State Gas Company, et
al., Algonquin Gas Transmission Company, Municipal
Distributors Group, Public Service Commission of the State
of New York, General Motors Corporation, Central Illinois
Public Service Company, Intervenors.
 Nos. 77-1666, 78-1041.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued May 4, 1979.
Decided Dec. 23, 1980.
 
 Petitions for Review of Orders of the Federal Energy Regulatory commission.
 John T. Miller, Jr., Washington, D. C., for petitioner.
 Andrew M. Zack, Atty., Federal Energy Regulatory Commission, Washington, D. C., for respondent.
 Howard E. Shapiro, Sol., Federal Energy Regulatory Commission, and Donald C. Shepler, Atty., Federal Energy Regulatory Commission, Washington, D. C., were on brief, for respondent.
 
 
 1
 Platt W. Davis, III, Washington, D. C., with whom J. Evans Attwell and Judy M. Johnson, Houston, Tex., were on brief, for intervenor Texas Eastern Transmission Corporation.
 
 
 2
 John E. Holtzinger, Jr., Karol Lyn Newman and Charles R. Brown, Washington, D. C., were on brief, for intervenor Consolidated Gas Supply Corporation.
 
 
 3
 Barbara M. Gunther, Joseph P. Stevens and Alvin Adelman, Brooklyn, N. Y., were on brief, for intervenor Brooklyn Union Gas Company.
 
 
 4
 William I. Harkaway, Washington, D. C., was on brief, for intervenor, Consolidated Edison Company of New York, Inc.
 
 
 5
 Jerome C. Muys and Paul T. Nowak, Jr., Washington, D. C., were on brief, for intervenor Somerset Gas Service of Somerset, Kentucky.
 
 
 6
 William R. Duff, Carl W. Ulrich, Washington, D. C., Edward S. Kirby and James R. Lacey, Newark, N. J., were on brief, for intervenor, Public Service Electric and Gas Company.
 
 
 7
 Francis J. McShalley and John S. Schmid, Washington, D. C., were on brief, for intervenor, Algonquin Gas Transmission Company.
 
 
 8
 Barton A. Hertzbach and Stephen Schachman, Philadelphia, Pa., were on brief, for intervenor, Philadelphia Gas Works.
 
 
 9
 William T. Miller, Washington, D. C., was on brief, for intervenor, Municipal Distributors Group.
 
 
 10
 Peter H. Schiff, Gen. Counsel, Public Service Commission, Albany, N. Y., Richard A. Solomon, Dennis Lane and Sheila S. Hollis, Washington, D. C., were on brief, for intervenor, Public Service Commission of the State of New York.
 
 
 11
 Edward J. Grenier, Jr., Richard P. Noland and Jay L. Lazar, Washington, D. C., were on brief, for intervenor, General Motors Corporation.
 
 
 12
 John D. Daly and Giles D. H. Snyder, Charleston, W. Va., were on brief, for intervenor, Columbia Gas Transmission Corporation in No. 77-1666 only.
 
 
 13
 Stephen J. Small, Charleston, W. Va., was on brief, for intervenor, Columbia Gas Transmission Corporation in No. 77-1666 only.
 
 
 14
 Also Edward H. Gerstenfield, Bethesda, Md., entered an appearance for intervenor, Carnegie Natural Gas Company in No. 78-1041 only.
 
 
 15
 Also John S. Schmid and Paul W. Fox, Washington, D. C., entered appearances for intervenor, Bay State Gas Company, et al. in Nos. 77-1666 and 78-1041.
 
 
 16
 Also James K. Mitchell, Bloomfield Hills, Mich., entered an appearance for intervenor, Central Illinois Public Service Company in Nos. 77-1666 and 78-1041 and intervenor, Arkansas-Missouri Power Company, et al. in No. 77-1666 only.
 
 
 17
 Also Jack M. Irion, Shelbyville, Tenn., entered an appearance for intervenor, United Cities Gas Company in No. 77-1666 only.
 
 
 18
 Also H. Kent Howard and Jon D. Noland, Indianapolis, Ind., entered appearances for intervenor, Indiana Gas Company, Inc. in No. 77-1666 only.
 
 
 19
 Also Robert C. Richards, Mineola, N. Y., entered an appearance for intervenor, Long Island Lighting Company in No. 77-1666 only.
 
 
 20
 Also Augustine A. Mazzei, Jr., Asst. General Counsel, Pittsburgh, Pa., entered an appearance for intervenor, Equitable Gas Company in No. 77-1666 only.
 
 
 21
 Also Christopher T. Boland and John F. Harrington, Washington, D. C., entered appearances for intervenor, Texas Gas Transmission Corporation in No. 77-1666 only.
 
 
 22
 Also Eugene J. Bradley, Philadelphia, Pa., entered an appearance for intervenor, Philadelphia Electric Company in No. 77-1666 only.
 
 
 23
 Also Philip R. Telleen, Atty., Federal Energy Regulatory Commission, Washington, D. C., entered an appearance for respondent in No. 77-1666 only.
 
 
 24
 Before LEVENTHAL*, ROBINSON and ROBB, Circuit Judges.
 
 Opinion PER CURIAMPER CURIAM:
 
 25
 Petitioner Elizabethtown Gas Company seeks review of a series of orders issued by the Federal Energy Regulatory Commission (FERC) and its predecessor the Federal Power Commission approving an interim plan for curtailment of gas by the Texas Eastern Transmission Corporation (Tetco). Elizabethtown challenges the validity of the curtailment plan as a system purportedly based upon the eventual end uses of natural gas, and questions the method established by FERC for challenging the data underlying the curtailment plan. Elizabethtown also raises arguments concerning the plan's exemption for small customers, the categorization of gas kept in storage in proportion to the actual uses served, and the reservation of the issue of compensation pending the development of a record on the need for a compensation feature. For the reasons which follow, we affirm the Commission's action in approving the plan here at issue.
 
 
 26
 Tetco owns and operates a major interstate natural gas pipeline extending from Texas to New York, selling gas to distributors for resale rather than directly to consumers (end-users). Petitioner Elizabethtown, one of Tetco's large distributors, purchases gas for resale from Tetco and two other interstate pipelines. In the early 1970's Tetco began experiencing shortages of natural gas, and was unable to fulfill its contractual sales obligations. In 1973, Tetco filed with the Commission tariff sheets detailing a system-wide plan for the curtailment of gas deliveries. After extensive proceedings at the agency level, FERC approved an interim curtailment plan which is currently in effect. The plan is based upon a settlement agreement approved by the vast majority of Tetco's purchasers. The dissenting purchasers sought review within the agency, but only Elizabethtown now seeks judicial review.[1]
 
 
 27
 Before the onset of natural gas shortages, Tetco's customers were entitled to receive up to 100% of the contracted-for supply. Under the curtailment plan, Tetco replaced these contract entitlements with Annual Quantity Entitlements (AQEs), based upon the volume of gas each distributor actually purchased from Tetco during a fixed period in the early 1970's, rather than upon the volume of gas to which the distributor was contractually entitled.
 
 
 28
 Tetco collected data regarding the actual use which the customers of its distributors made of the gas purchased from Tetco (end-use data) for the base period, and established a system of priorities for the curtailment of gas. The Tetco plan places residential and small uses of natural gas in the highest priority (priority 1). Priority 2 includes such needs as larger commercial requirements, firm not interruptible industrial requirements, and plant protection. The lowest priority (priority 9) is composed of interruptible requirements over a certain volume per day, for which alternative fuel sources are available. The lower priorities are to be fully curtailed before higher priorities are affected under the Tetco plan.
 
 
 29
 The Commission held hearings on various aspects of the Tetco plan, and adopted with modifications the agreement submitted by the parties but opposed by Elizabethtown. The agreement accepted by the AQE system in place of contract entitlements, and approved the priority of service categorization with an exception to provide for "storage sprinkling." Storage sprinkling requires that gas placed in storage during the summer be reclassified according to its actual end use during the winter months, when it is withdrawn from storage. The agreement also provided for a "peak day exemption" for small customers with no alternative gas supply, to exempt them from curtailment below their maximum contract entitlement on any one day. In addition, the plan completely exempted from curtailment the priority 1 volumes of small customers, provided that they incur no net growth that would increase their dependence on Tetco for gas.
 
 
 30
 In Opinion 787, the FPC concluded that the data base underlying the end-use curtailment calculations should be subject to cross-examination by the parties, but that this procedure would be considered waived if the challenging parties did not demonstrate to the administrative law judge the areas of unreliability in the current data. The Commission also determined that the record relating to storage sprinkling should be supplemented, and that the plan would be an interim rather than a permanent one, until the Commission could review a final environmental impact statement. In all other respects the Commission accepted the settlement as an interim curtailment plan as of September 1, 1976. In Opinion 787-A, the FPC on rehearing found that the appropriateness of a compensation feature should be considered by the administrative law judge in remanded proceedings, reaffirmed its other conclusions, and ordered Tetco to make necessary filings to implement the interim plan. In Opinion 787-B, FERC concluded that implementation of storage sprinkling was required, in view of the decision of this court in City of Willcox v. Federal Power Commission,[2] the record compiled, and the revised tariff sheets filed by Tetco. Petitioner Elizabethtown now appeals from the series of orders approving the Tetco plan.
 
 The end-use plan
 
 31
 When Tetco originally entered into contractual agreements with its customers, it apparently agreed to provide the purchasers with as much gas as they could use with as much as the pipes could carry at maximum flow. This volume became known as contractual entitlement. An AQE is based upon the quantity of gas which a particular distributor actually purchased from Tetco during an "average" year, as opposed to the quantity of gas which that particular distributor was contractually entitled to purchase. Larger distributors historically purchased about 97% of their contract entitlements, while small distributors historically purchased only about 38% of theirs. Under the curtailment plan, purchaser is restricted to the quantity of gas which it normally purchased in an average year (the AQE), rather than its contractual entitlement. Curtailment of AQEs takes place according to the priority classifications under the Tetco plan.
 
 
 32
 Elizabethtown first contends that the approved plan is not really an end-use plan, and that curtailment pursuant to the plan effects undue discrimination and unjust and unreasonable results, in violation of 15 U.S.C. § 717c. Elizabethtown argues that the plan curtails wholesalers rather than end-users, on the basis of claimed end-use requirements, while the wholesalers are free to distribute the gas according to operational requirements. Thus, petitioner asserts that because Tetco serves wholesalers, it actually has no "high priority" or "low priority" customers, and therefore FERC could not evaluate the varying impact of the plan on ultimate consumers. Elizabethtown would substitute for this end-use plan a plan based on a straight pro rata sharing of the shortfalls based upon historical usage of Tetco's supply.
 
 
 33
 We reject petitioner's contention that because Tetco's customers are wholesalers, its curtailment plan cannot be based upon the ultimate end use of the gas supply. The legality of end-use plans as an appropriate method of curtailment is firmly established. State of North Carolina v. FERC, 190 U.S.App.D.C. 22, 26, 584 F.2d 1003, 1007 (1978); Consolidated Edison Co. v. FPC, 168 U.S.App.D.C. 92, 98, 105-06, 512 F.2d 1332, 1338, 1345-46 (1975). Although the Commission cannot control how the gas is actually used, it may found a curtailment plan upon a profile of each distributor, drawn by reference to detailed information from end-use customers who purchase gas from Tetco's buyers.
 
 
 34
 Elizabethtown also contends that FERC was not justified in relying upon the end-use data collected by Tetco, because the information was not submitted under oath, and that FERC improperly placed on challengers of the plan the burden of establishing the data's unreliability. The priority profiles of the Tetco purchasers were compiled based on a questionnaire which Tetco had sent to each of its purchasers, asking for information as to how the gas which they distributed was actually used by their customers for the base period. During the hearings on the plan, a data verification committee was established to review the submitted data, with each party entitled to participate. The committee collected additional detailed information from each distributor. All parties were free to review this data, and to contest the accuracy of the data base.
 
 
 35
 Elizabethtown, among others, actively participated in the data verification proceedings. At the conclusion of the proceedings the Commission believed that there were no major deficiencies in the data base, but to achieve further accuracy it remanded the data issue to the administrative law judge with directions for opposing parties to take the lead in identifying problem areas. No party, including Elizabethtown, took advantage of this opportunity.
 
 
 36
 This court affirmed FERC implementation of a similar method for compiling curtailment data customer reports to the pipelines regarding ultimate end use of natural gas in City of Willcox v. FPC, 185 U.S.App.D.C. 287, 313-14, 567 F.2d 394, 420-21 (1977), cert. denied, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). In that case, the court rejected petitioners' challenge to collected data and their request for cross-examination of the distributors' figures, and upheld FERC's determination that the distributors' "nominations" were presumptively accurate, absent a showing of specific evidence of substantial abuse. The opinion also pointed out that any other program for estimating usage probably would involve some degree of inaccuracy. The court specifically noted that "the Commission has here merely chosen a method of obtaining the data necessary to implement its end-use curtailment plan. Absent a strong showing of unworkability, methodology is best left to an enforcing agency's own determination." Id. at 314, 567 F.2d at 421. The Commission here made similar efforts to procure accurate data and to provide challenging parties an opportunity to show substantial shortcomings in the method. Since Elizabethtown failed to make such a showing, or even to participate in the proceeding for doing so, we affirm FERC's action in relying upon the data submitted by Tetco's customers.
 
 
 37
 In its brief on appeal, Elizabethtown argues that the end-use data on which curtailment is based must be updated, because end users may now be using gas in different proportions than they were in 1973. Relying on State of North Carolina v. FERC, 190 U.S.App.D.C. 22, 584 F.2d 1003 (1978), petitioner claims that the profiles which establish priorities for curtailment may no longer be accurate. It became evident at oral argument, however, that this issue was not raised before the Commission. Elizabethtown may not now challenge for the first time the agency's failure to update the data base underlying the curtailment plan.[3] See D.C. Transit System, Inc. v. Washington Metropolitan Area Transit Authority, 151 U.S.App.D.C. 223, 242-43, 466 F.2d 394, 413-14, cert. denied, 409 U.S. 1086, 93 S.Ct. 688, 34 L.Ed.2d 673 (1972).
 
 Small customer exemption
 
 38
 The curtailment plan exempts in two respects small wholesale customers whose contract entitlements are below a certain level[4] and who have no other pipeline suppliers. These customers have a peak-day exemption, which allows them to take up to their maximum daily contract entitlement on days of peak usage (rather than be limited to the AQEs established under curtailment), and are completely exempt from curtailment as to their priority 1 (residential and small commercial) requirements. Elizabethtown complains that the priority 1 exemption, leaves uncurtailed, without justification, the priority 1 requirements of small customers, while similar requirements of other wholesale customers are curtailed. Petitioner asserts that the exempt smaller customers are not a separate class justifying preferential gas service, and that the result is undue discrimination because larger customers are forced to meet their needs by resort to more expensive supplemental gas supplies. Elizabethtown also challenges FERC's conclusion that the impact of the exemptions would be de minimis.
 
 
 39
 The small customer exemption does not unduly discriminate against large distributors, but rather, is a reasonable means of protecting high priority uses of small distributors under the end-use curtailment plan. The change to AQE from contract entitlement impacted on small customers more heavily than on large, because the latter have low priority, interruptible requirements upon which to draw during periods of peak use, while the small customers historically relied on their contract entitlements to provide flexibility. Since the small distributors purchased only about 38% of their contract entitlements during the base period, as compared to approximately 97% for the large distributors, the small distributors lost their flexibility when the curtailment plan redefined entitlement according to actual purchases during the fixed period. Without an exemption, therefore, the small customers could not adequately protect service to high priority users during periods of deep curtailment. In contrast to the small distributors' dependence on the Tetco supply, the large distributors generally obtain gas from a variety of sources, and even can generate it themselves.
 
 
 40
 Curtailment therefore imposes special hardships on Tetco's small customers. Their use of capacity to transport gas historically was much lower than that of larger customers, they have few or no industrial or interruptible customers, and they have much less operating flexibility to withstand periods of deep curtailment. In addition, the effect of the exemption on larger distributors is minimal. The Commission found that the small customer exemption for priority 1 service would only increase the curtailment of the remaining distributors by approximately .46%. The hardship of forcing the small distributors to find alternative sources of gas for priority 1 uses outweighs the negligible increase in curtailment of the larger distributors. Under the circumstances, therefore, the provision exempting from curtailment the priority 1 uses of small customers is a reasonable means of protecting the higher priority uses against the impact of curtailment.
 
 Storage Sprinkling
 
 41
 The interim curtailment plan provides for storage sprinkling, which involves classifying gas placed in storage in all priorities according to the winter market profile of each Tetco customer. This procedure is designed to reflect more accurately the actual end use of the stored gas. Initially the Commission had thought that all gas pumped into storage should be treated as priority 2 gas, but later it decided that because storage reflects a deferral of use rather than an end use, such gas should be classified according to its actual winter use. Consequently, the Commission "sprinkled" the storage gas among all nine priorities of a distributor in accordance with the winter market profile of that distributor.
 
 
 42
 Elizabethtown objects to this mechanism, claiming that it unjustifiably suffers increased curtailment as other distributors' stored gas is promoted from priority 2 to priority 1. Petitioner contends that FERC failed to justify its sudden adoption of storage sprinkling, and improperly shifted the burden of justification from Tetco to its customers.
 
 
 43
 The Commission, however, had not completely rejected the idea of storage sprinkling in its earlier opinions, but had found the record incomplete and had remanded the issue to the administrative law judge. Tetco then filed revised tariff sheets containing sprinkling provisions. In addition, this court's intervening decision in City of Willcox v. FPC required that "the priority accorded to natural gas kept in storage be in proportion to the eventual end-uses of that gas, unless the Commission wishes to support with an evidentiary hearing the importance of storage gas irrespective of the end-use to which it is eventually put." 185 U.S.App.D.C. 287, 307, 567 F.2d 394, 414 (1977), cert. denied, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978). Storage sprinkling categorizes gas pumped into storage during slack periods according to its use during peak months of consumption. Thus, after Willcox, FERC in Opinion 787-B concluded that its priority 2 treatment of storage gas was unreasonable, and that the end-use classification in the revised tariff sheets, which provided for storage sprinkling, was required. The Willcox mandate compels such a provision, absent proof to the contrary. FERC was therefore more than justified in approving the Tetco plan with the sprinkling provision, as a means of categorizing storage gas according to its end use.
 
 Compensation
 
 44
 Elizabethtown challenges FERC's approval of the curtailment plan prior to determining the appropriateness of a compensation feature, and urges that if compensation is in order, it be made retroactive to the implementation of the curtailment plan under review. Review of the compensation issues at this stage is premature. The settlement submitted to FERC by the parties did not include a compensation feature, and thus provided no record support for such a feature in the interim plan. Until this court's decision in Elizabethtown Gas Co. v. FERC, 188 U.S.App.D.C. 4, 575 F.2d 885 (1978), FERC believed it lacked the power to include compensation provisions in curtailment plans. The Commission therefore had approved the interim curtailment plan in this case before learning that a compensation scheme might be in order. Subsequently the Commission initiated further proceedings, presently unresolved, to determine whether a compensation provision should be included in Tetco's curtailment plan. The relevant precedent[5] requires consideration of the issue on an appropriate record, but does not mandate that this court withhold approval of the underlying curtailment plan pending such consideration.
 
 
 45
 We therefore conclude that the Federal Energy Regulatory Commission acted properly in approving the provisions of the Texas Eastern Transmission Corporation curtailment plan here under review. Accordingly, the orders approving the interim plan are
 
 
 46
 Affirmed.
 
 
 
 *
 Circuit Judge Leventhal, a member of the panel which heard oral argument in this case, died before the case was decided
 
 
 [1]
 One intervenor supports Elizabethtown's position on appeal
 
 
 [2]
 185 U.S.App.D.C. 287, 567 F.2d 394 (1977), cert. denied, 434 U.S. 1012, 98 S.Ct. 724, 54 L.Ed.2d 755 (1978)
 
 
 [3]
 While petitioner raises this issue too late in the day, we note that a number of factors distinguish this case from North Carolina v. FERC. None of the numerous parties to this proceeding including Elizabethtown complains of a mismatch between the data relied upon and the current market realities, nor is there any proof of such a problem. In North Carolina, by contrast, the court noted repeatedly the likelihood of disparity between the data and the current conditions, and the severity with which curtailment under the plan struck certain regions. Id. at 29-33, 584 F.2d at 1010-14. That opinion specifically found that the Transco end-use system fell "with unmitigated harshness on customers who are wholly dependent upon Transco," and did not adequately protect current high priority uses. Id. at 31-33, 584 F.2d at 1012-14. The Tetco curtailment plan contains features which address the concerns underlying the remand in North Carolina protection of current high priority needs of small distributors. See Id. at 32 n.20, 33 n.28, 584 F.2d at 1013 n.20, 1014 n.28. The peak-day exemption for users with no alternative supply, the total exemption of priority 1 uses of small customers, and the categorization of storage gas according to actual use all reflect the concern of the drafters of the Tetco plan that the end-use curtailment system adequately safeguards high-priority uses
 
 
 [4]
 74 of Tetco's 98 distributors are "small distributors," who collectively distribute only about 1.5% of Tetco's supply
 
 
 [5]
 Elizabethtown Gas Co. v. FERC, 188 U.S.App.D.C. 4, 575 F.2d 885 (D.C.Cir.1978); Mississippi Public Service Commission v. FPC, 522 F.2d 1345 (5th Cir. 1975), cert. denied, 429 U.S. 870, 97 S.Ct. 181, 50 L.Ed.2d 149 (1976)