CITIES OF LAKELAND & TALLAHAS-
SEE, & GAINESVILLE REGIONAL
UTILITIES

v.

FEDERAL ENERGY REGULATORY
COMMISSION.

The LAKE WORTH UTILITIES AU-
THORITY and The Utilities Commission
of New Smyrna Beach, Florida,

v.

FEDERAL ENERGY REGULATORY
COMMISSION.

No. 81–5208.

United States Court of Appeals,
Eleventh Circuit.

April 4, 1983.

David R. Straus, Spiegel & McDiarmid, Joseph Van Eaton, Washington, D.C., for Cities of Lakeland & Tallahassee & Gainesville Regional Utilities.

Charles F. Wheatley, Jr., Don Charles Uthus, James Howard, Wheatley & Wollesen, Washington, D.C., for Lakeworth Utilities Authority and the Utilities Com'n of New Smyrna Beach, Fla.

Auburn L. Mitchell, F.E.R.C., Washington, D.C., for F.E.R.C.

Platt W. Davis, III, Washington, D.C., for Fla. Gas Transmission Co., Peoples Gas System, Inc., Lake Worth Util. and New Smyrna Beach Util. Com'n.

Ned Willis, Perry, Iowa, for Buckeye Cellulose Corp., Gardinier, Inc., Southern Gas, Gainesville Gas, Gulf Natural Gas Co.

Eugene E. Threadgill, Washington, D.C., for Central Fla. Gas Corp.

Before RONEY, TJOFLAT and HATCHETT, Circuit Judges.

TJOFLAT, Circuit Judge:

This is a petition for review[1] of a Federal Energy Regulatory Commission decision to implement a curtailment plan[2] for natural gas distributed by the Florida Gas Transmission Company (Florida Gas). The petitioners are municipally owned electricity generating companies that use gas as boiler fuel. They ask us to set aside the Commission's curtailment plan, which accords them a low priority, and to remand the case to the Commission for further proceedings. We affirm the Commission.

I.

Since this petition is the result of five years of litigation, involving one prior petition to this court, we find it necessary first to recite the history of this case in some detail.

Florida Gas has operated a pipeline extending from South Texas to South Florida since December 29, 1956. It uses this pipeline to transport natural gas that it purchases in Texas, to Florida.[3] Florida Gas sells this gas either as "firm gas" or "interruptible gas." Firm gas is gas that a seller contracts to deliver "within a given time period and which anticipates no interruptions, but which may permit unexpected interruption in case the supply to higher priority customers is threatened." *Arkansas Power & Light Co. v. FPC*, 517 F.2d 1223, 1230 n. 20 (D.C.Cir.1975), *cert. denied*, 424 U.S. 933, 96 S.Ct. 1146, 47 L.Ed.2d 341 (1976). Interruptible gas is gas that a seller is not obligated to deliver "within a given time period, and which anticipates and permits interruption on short notice, or [gas delivered] under schedules or contracts which expressly or impliedly require instal-

lation of alternate fuel capability." *Id.* Florida Gas sells both firm and interruptible gas directly to some large industrial users and indirectly (through gas distributing companies) to smaller industrial and non-commercial users.

When the pipeline was built, it was not large enough to transport sufficient gas to satisfy its customers' demands. To deal with this problem, Florida Gas began operations under a curtailment plan. *Houston Texas Gas & Oil Corp.*, 16 F.P.C. 118 (1956). This curtailment plan provided that (1) firm direct and firm indirect gas receive the highest priority and be curtailed last; (2) indirect interruptible gas receive the next priority; and (3) direct interruptible gas receive the lowest priority and be curtailed first.

Florida Gas operated under this plan without challenge until the late 1960's. Then, the City of Gainesville alleged in a rate proceeding before the Federal Power Commission (FPC)[4] under sections 4 and 5 of the Natural Gas Act (NGA), 15 U.S.C. §§ 717c and 717d (1976), that the plan was discriminatory because it curtailed Gainesville's purchases of direct interruptible gas before it curtailed purchases of indirect interruptible gas. Gainesville argued that purchases of direct and indirect interruptible gas should be treated similarly. The FPC disagreed, however, holding that the different prices paid for direct and indirect interruptible gas justified the different treatment. *Florida Gas Transmission Co.*, 47 F.P.C. 341, 380–81 (1972).

About the time the *Florida Gas Transmission Co.* proceedings concluded, a severe natural gas shortage arose. To deal with this shortage, the FPC ordered each interstate pipeline that anticipated supply short-

1. Jurisdiction for this petition lies under Section 19(b) of the Natural Gas Act (NGA), 15 U.S.C. § 717r(b) (1976).

2. A curtailment plan is a scheme for apportioning natural gas among a pipeline's customers during periods when demand exceeds supply.

3. Florida Gas also transports to Florida gas purchased in Texas by Florida Power Corporation and Florida Power and Light Company. This "transport gas" is not subject to the cur-

tailment plan at issue here. *See Sebring Utils. Comm'n. v. FERC*, 591 F.2d 1003, 1016–19 (5th Cir.), *cert. denied*, 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979).

4. On October 1, 1977, Congress transferred the FPC's functions and regulatory responsibilities to the Secretary of Energy and the Federal Energy Regulatory Commission. 42 U.S.C. § 7172 (Supp. IV 1980).

ages to file a curtailment plan. Order No. 431, 45 F.P.C. 570 (1971). The pipelines responded with a variety of curtailment plans. Florida Gas did not file a plan because it already had a curtailment plan in place. It merely filed a report with the FPC stating that no changes in its plan were necessary to accommodate the supply shortage. The FPC never acted on this report.

As the gas shortage continued, the FPC decided that an end-use curtailment plan[5] was preferable to other types being filed by the pipelines, and it promulgated a sample nine-priority end-use plan. Order No. 467, 49 F.P.C. 85 (1973). Meanwhile, Florida Gas continued to adhere to its existing plan.

On March 21, 1975, Lehigh Portland Cement Company sought an FPC declaration that Florida Gas' curtailment plan was discriminatory, and therefore unlawful, under section 5(a) of the NGA.[6] Lehigh, faced with increased curtailments caused by the gas shortage, alleged that the plan was unduly discriminatory because it curtailed the direct interruptible gas purchased by Lehigh before it curtailed the indirect interruptible gas purchased by Lehigh's competitor, Maule Industries, Inc. As a remedy, Lehigh asked the FPC to replace the curtailment plan with an end-use plan that would similarly curtail direct and indirect interruptible gas used for similar purposes.

Although the FPC lacked jurisdiction to entertain Lehigh's claim of discrimination, it did not terminate the proceedings; instead, the FPC set the matter for a hearing on its own motion, which it had the authority to do.[7] In September 1975, an Administrative Law Judge (ALJ) convened the hearing. He decided to hear the case in two phases: in Phase I, he would determine whether Florida Gas' curtailment plan was discriminatory; if discriminatory, in Phase II he would consider alternative curtailment plans. The ALJ decided Phase I on August 6, 1976. He first noted that in *Florida Gas Transmission Co.* the FPC held Florida Gas' plan valid under a similar claim of discrimination. He also noted, however, that there was a difference in kind between the curtailment involved there—capacity induced—and the curtailment involved here—supply induced. Nonetheless, the ALJ considered this distinction unimportant and held the plan not discriminatory, thereby precluding the need for further proceedings.

Several parties took exception to this ruling. On June 24, 1977, the FPC reversed the ALJ's decision. *Lehigh Portland Cement Co. v. Florida Gas Transmission Co.,* 20 Pub.Util.Rep. 4th 343 (1977). The Commission held that the severe, and continuing, natural gas shortage so changed the operation of Florida Gas' curtailment plan that *Florida Gas Transmission Co.* could be followed no longer. It therefore reexamined the curtailment plan, found it to be discriminatory, and ordered Florida Gas to file a new plan. On rehearing, the FPC modified its order that Florida Gas file a new curtailment plan. *Lehigh Portland Cement Co. v. Florida Gas Transmission Co.,* 22 Pub.Util.Rep. 4th 384 (1977). Instead, it ordered the ALJ to draw a curtailment plan "based on end use and equality for all who make similar use of the gas," Joint Appendix at 486, and gave the pipeline "six weeks

---

5. An end-use curtailment plan allocates gas according to the essentiality or desirability of the purchaser's use of the gas. *See North Carolina v. FERC,* 584 F.2d 1003, 1007 (D.C.Cir.1978).

6. See note 7 *infra.*

7. Section 5(a) of the NGA provides:
   Whenever the Commission, after a hearing had upon its own motion or upon complaint of any State, municipality, State commission, or gas distributing company, shall find that any ... classification ... observed ... by any natural-gas company in connection with

any transportation of natural gas, subject to the jurisdiction of the Commission ... is unjust, unreasonable, unduly discriminatory, or preferential, the Commission shall determine the just and reasonable ... classification ... to be thereafter observed in force, and shall fix the same by order ....
Since Lehigh was not a "State, municipality, State commission, or gas distributing company," the FPC did not have jurisdiction to entertain Lehigh's complaint of discrimination. However, the FPC did have jurisdiction to hear the matter on its own motion, which it did.

to file its views on a proper plan, with evidence in support." *Id.* The FPC also ordered that the old curtailment plan would remain in effect pending the implementation of the new plan. On petition for review, this court affirmed the FPC's decision. *Sebring Utilities Commission v. FERC,* 591 F.2d 1003 (5th Cir.), *cert. denied,* 444 U.S. 879, 100 S.Ct. 167, 62 L.Ed.2d 109 (1979).

While the *Lehigh* appeal was in process, the ALJ commenced the Phase II hearing to determine a new curtailment plan. Florida Gas proposed an end-use curtailment plan modeled after FERC Order No. 467, adjusted to account for the pipeline's particular circumstances. Other parties, all customers of the pipeline or its distributors, filed objections to this plan and sought modifications thereof. On August 4, 1978, the ALJ concluded the hearing except for the environmental impact evidence required by the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332(2)(C) (1976),[8] and set a briefing schedule. On November 1, 1978, the parties filed their initial briefs.

On November 9, 1978, Congress enacted the Natural Gas Policy Act of 1978 (NGPA), 15 U.S.C. §§ 3301–3432 (Supp. V 1981). On November 17, the Commission announced that it would promulgate rules to implement the curtailment policy established by the Act; it also called for a prehearing conference and report to determine the effect the NGPA and the new regulations might have on the Florida Gas curtailment proceedings. The Commission then suspended these proceedings for 180 days. The prehearing conference convened on April 3, 1979. During the conference, Florida Gas' counsel informed the parties that the company had filed, and the Commission had accepted, a set of temporary tariff sheets to give effect to the new law. Counsel also stated that the company's gas supply had improved and that the pipeline expected to be "running full" that summer, without any curtailments.

On April 4, 1979, a new ALJ was designated to preside over the case. On April 24, he reported to the Commission what had transpired at the prehearing conference. On that date, the Commission ordered the ALJ to decide whether an interim curtailment plan should be implemented, and if so, its terms. The Commission also ordered the parties to brief the issue by June 5, 1979. After receiving the briefs, the ALJ convened a hearing to decide whether to implement an interim curtailment plan. The parties offered no evidence; accordingly, the ALJ closed the record and proceeded to hear the parties' arguments.

Two of the petitioners now before us, Lake Worth Utilities Authority (Lake Worth) and the Utilities Commission of New Smyrna Beach (New Smyrna), argued that the supply of gas had greatly improved and that there was no need for a new curtailment plan. Petitioners cited the representation Florida Gas had made at the April 3 prehearing conference that the pipeline would be "running full" during the summer and that no supply induced curtailments would occur before the 1979–1980 winter season. Petitioners also cited Florida Gas' recently filed Form 16 report of anticipated curtailments, which indicated

---

**8.** Section 102(C), 42 U.S.C. § 4332(2)(C) provides:

The Congress authorizes and directs that, to the fullest extent possible:

\* \* \* \* \* \*

(2) all agencies of the federal government shall—

\* \* \* \* \* \*

(C) include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on—

(i) the environmental impact of the proposed action,

(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

(iii) alternatives to the proposed action,

(iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

(v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

that the pipeline expected an improvement in the supply of gas. Florida Gas, citing the same report, argued that deliveries would be curtailed over the next thirty-six months, through March 31, 1981.

In his Phase II decision, handed down on August 29, 1979, the ALJ rejected petitioners' argument that an improved supply of gas rendered a new curtailment plan unnecessary. He concluded that the pipeline would experience a supply shortage over the next three years, ultimately resulting in the complete curtailment of gas used for boiler fuel and substantial curtailment of gas used for other industrial purposes. Accordingly, the ALJ fashioned and recommended the implementation of an interim curtailment plan based on end-use. He labeled this plan "interim" because the environmental review required by NEPA had not been completed.

The interim curtailment plan prescribed by the ALJ did not conform to the end-use plan proposed by Florida Gas. The primary difference in the plans, which is a point of contention here, involved the priorities accorded boiler and non-boiler fuel users. Florida Gas proposed to curtail boiler fuel users before non-boiler fuel users; the ALJ gave them the same priority.

Florida Gas, numerous industrial customers, including some boiler fuel users, and the Commission staff took exception to the ALJ's decision. In addition, Lake Worth and New Smyrna moved the Commission to reopen the proceedings on the ground that Florida Gas had misrepresented its natural gas supply to the Commission and the ALJ. According to these petitioners, the pipeline anticipated a greater supply of gas in 1979, 1980, and 1981 than it represented in the evidence it produced at the Phase I hearing and in its Form 16 reports of anticipated curtailments filed with the Commission. Petitioners therefore urged the Commission to reopen the proceedings to determine whether a supply shortage in fact existed and a new curtailment plan was needed.

On October 10, 1980, the Commission denied the motion to reopen the proceedings and rendered its decision. Joint Appendix at 557. It modified the ALJ's interim curtailment plan and gave non-boiler fuel users a higher priority than boiler fuel users. On rehearing, the Commission further modified the plan to provide volumetric priorities for boiler fuel users. It then ordered this plan implemented within thirty days. *Id.* at 610. Florida Gas complied with this order in early 1981.

Two groups of parties, all of whom generate electricity through gas-fired boilers, filed the petition for review now before us. The first group consists of Lake Worth and New Smyrna, indirect interruptible customers of the pipeline. The second group consists of the Cities of Lakeland and Tallahassee, and Gainesville Regional Utilities, all direct interruptible customers of the pipeline. Collectively, these petitioners advance six reasons why we should vacate the Commission's decision and remand the case for further proceedings: (1) the supply of gas has improved to such an extent that the Commission should reconsider whether a new curtailment plan is necessary; (2) in drawing the interim curtailment plan, the Commission should have considered its impact on petitioners' ability to compete in the electricity generating industry; (3) in drawing the interim curtailment plan, the Commission should have considered its economic impact on consumers of electricity; (4) the Commission improperly imposed on the boiler fuel users the burden of proving that they should be given the same priority as non-boiler fuel users; (5) the Commission's decision to subordinate boiler fuel users to non-boiler fuel users was not supported by substantial evidence; and (6) the Commission lacked authority to implement an interim curtailment plan without complying with NEPA's environmental requirements. We now consider each of these arguments.

## II.

Petitioners [9] ask us to direct the Commission to reopen these curtailment proceedings to determine whether, in light

---

**9.** Only Lake Worth and New Smyrna make this argument.

of the current supply of gas, Florida Gas' original curtailment plan is still discriminatory and thus unlawful under section 5(a) of the NGA. They contend that the pipeline's supply of gas has markedly improved since the Commission determined in Phase I that the original plan was discriminatory. Petitioners base this contention on representations Florida Gas' counsel allegedly made on November 5, 1979, at a settlement conference in an unrelated proceeding before the Commission involving purchase gas agreements, Docket No. RP–136 (PGA 79–2). According to petitioners, at that conference, which occurred after the record in these curtailment proceedings had been closed, Florida Gas' counsel indicated that the pipeline anticipated delivery to its customers of 179.55 MMMBtu in 1979, 175.9 MMMBtu in 1980, and 185.06 MMMBtu in 1981, volumes of gas substantially in excess of what the pipeline had represented to the ALJ and the Commission that it would deliver during these years.

Petitioners make no claim that these larger volumes of gas would eliminate the need for the end-use curtailment plan the Commission has drawn; what they do claim is that the Commission should reopen these proceedings so that a true estimate of the pipeline's gas supply can be made and the need for a new curtailment plan reassessed. The Commission rejected this argument; so do we.

The ALJ and the Commission have already considered petitioners' claim that Florida Gas anticipated a greater supply of gas during the thirty-six months ending March 31, 1981, than it represented to the Commission. In June 1979, petitioners argued in their brief to the ALJ that Florida Gas' Form 16 projection of gas curtailments showed a marked improvement in the pipeline's gas supply.[10] They also cited representations Florida Gas' counsel had made at the April 3, 1979, prehearing conference that there was plenty of gas in prospect.[11] The ALJ rejected petitioners' claims of ade-

quate gas supply, giving credence to the record evidence and the pipeline's Form 16 report. The ALJ summed up the record evidence with these words:

> At the trial, the case was certainly complete if the presentation of a great lot of figures adds up to ultimate truth. (See Exs. 4, 36–39). Against an annual need of 172 million MMBtu, the deliveries for 1979 were expected to be down to 152 million, meaning a curtailment of 12% to afflict all the months of 1979 except July through October. Next year it goes up to 15%, some in every month; a year later it is 29% and rising. So, for 1981, that means taking 89% of the need from the very large boilers, 35% from the next smaller size, 21% from the third smallest, and 14% from the next smaller size boilers, meaning the ones taking 300 MMBtu per day. For three years ahead of now, the dire prediction is that curtailment will reach into the purely industrial categories after all boiler fuel is cut off under Florida's plan.

Joint Appendix at 495. As for the Form 16 report that petitioners read as showing an improved supply, the ALJ remarked:

> one party cites a recent report in the Commission's files giving evidence of plenty of gas currently in prospect. However, [Florida Gas'] reply, evidently looking at the same filing, reads the report as showing 151.3 million MMBtu for the 12 months ending next March [1980], or about the same as the first report cited above. In other words, we are back to the beginning.

*Id.* The ALJ's final comment in rejecting petitioners' claim that gas supplies were adequate was that "it would be foolhardy indeed to conclude that no curtailment is to be expected, even in the near term." *Id.*

Having failed to convince the ALJ that the gas supply had materially improved and that the need for a new curtailment plan should therefore be reconsidered, petition-

---

**10.** The record before us does not contain the Form 16 report; nor does it indicate the years covered by the report.

**11.** The record before us does not contain a transcript of the prehearing conference or of counsel's representations.

ers turned to the Commission. They moved the Commission to reopen the proceedings, claiming once again that Florida Gas had misrepresented the supply picture to the Commission and the ALJ by understating the volumes it anticipated delivering during the three-year period ending March 31, 1981. In their motion, petitioners quoted from the same Form 16 report they had cited to the ALJ and some representations Florida Gas' counsel made at a November 5, 1979, settlement conference in some unrelated proceedings concerning purchase gas agreements [12] to show that the company's lawyers painted a much brighter picture of gas supplies when trying to settle a case than they did in their Form 16 reports or in urging the Commission to adopt their curtailment plan. The Commission perfunctorily denied petitioners' motion to reopen, observing in passing that Florida Gas' latest Form 16 report indicated that the pipeline anticipated some curtailment during the 1979–80 winter season.

We think the Commission acted well within its discretion in refusing to reopen the proceedings to receive additional evidence of the pipeline's gas supply. Petitioners had an opportunity to present such evidence to the ALJ when he was considering whether to implement an interim curtailment plan, but they chose not to present it. Rather, they chose to rely on argument; they attempted to persuade the ALJ to reject the evidence adduced at the Phase I hearing and to rely instead on the statements Florida Gas made at the April 3, 1979, prehearing conference and in its Form 16 report. Petitioners chose much the same tactic, pitting the words of lawyers against the record evidence, when they subsequently moved the Commission to reopen the proceedings. The Commission and the ALJ considered these arguments and rejected them. Implicit in both the Commission's and the ALJ's rejections of petitioners' arguments is the notion that the petitioners have had their day in court. We agree and therefore find no reason to remand the case

to the Commission for further consideration.

### III.

Petitioners next argue that in drawing the curtailment plan, the Commission should have considered its impact on petitioners' ability to compete in the electricity generating industry. Had the Commission considered this impact, the Commission would have found that its plan would weaken the petitioners' ability to compete with other companies whose gas purchases would not be curtailed under the plan, most noticeably Florida Power Corporation and Florida Power and Light Company,[13] and therefore would have accorded petitioners a higher priority. We need not determine whether the Commission had a duty to consider the sort of competitive effect petitioners describe because we find that the Commission gave it full consideration. In its decision on rehearing, the Commission considered and rejected

> [petitioners] charge that the competitive impact of the [interim] plan . . . is cause for its additional modification. The impact which [petitioners] describe is the impact which curtailment of [them] will have on their ability to compete with Florida Power and Florida Power and Light (FP&L). The latter two companies reportedly purchase a large volume of gas at the wellhead and this gas is not subject to the curtailment plan. What [petitioners] apparently do not recognize is that the competitive impact which they describe stems not from the curtailment plan. It originates from different supply arrangements that arose previously and without any reference to the curtailment plan. Thus unlike cases involving price squeeze, we are not confronted by circumstances in which similarly-situated customers are being treated differently by the entity we regulate. [Petitioners,] FP&L, and Florida Power are not similarly-situated because the first of them

---

12. The record before us does not contain a transcript of the settlement conference or of counsel's representations.

13. See note 3 *supra*.

has contracted for a supply arrangement different from the others.

Furthermore, the gas which Florida Power or FP&L might purchase from [Florida Gas] and which is subject to the curtailment plan is delivered pursuant to primary interruptible contracts. This primary interruptible gas receives a lower priority than the boiler fuel gas purchased by [petitioners]. To the extent that Florida Power or FP&L relies on primary interruptible sales, therefore, the [petitioners'] competitive posture can only be enhanced.

Finally, we note that if the relief sought by [petitioners] were granted, numerous customers of [Florida Gas] would be more heavily curtailed in order to protect [petitioners] from competition with two companies whose transportation gas is not subject to the plan. Such a result is inappropriate because it would penalize parties who are strangers to the competitive situation.

Joint Appendix at 617 n. 7 (citations omitted).

### IV.

■ Petitioners' third argument is that in drawing the new curtailment plan, the Commission should have considered its economic impact on consumers of electricity. They point out that gas is currently the cheapest available boiler fuel and that the Commission's interim curtailment plan would force them to convert to a more expensive boiler fuel such as oil. When they so convert, the price that consumers, including homeowners, will have to pay for electricity will rise. According to petitioners, the Commission is required to consider such an economic consequence in drawing a curtailment plan, and since the Commission did not consider it in this case, we must remand the case to the Commission for further proceedings. We cannot agree.

The only authority petitioners cite in support of their argument is *North Carolina v. FERC*, 584 F.2d 1003 (D.C.Cir.1978). That

case, however, does not support their argument. It holds simply that the Commission, in fashioning an end-use curtailment plan for a pipeline, must examine the use each purchaser will make of the gas that purchaser will receive.

In *North Carolina*, the petitioners contended that the Commission did not know enough about the purchasers' use of gas to ensure that the purchasers would actually be curtailed on the basis of end-use. The court agreed and remanded the case to the Commission so that it could determine how the plan would treat the purchasers. In its opinion, the court referred to some of these purchasers, those that purchased gas through a gas distributor, as "ultimate consumers." Petitioners seize upon this characterization to make their argument that the Commission must consider the economic impact of gas curtailment on the electricity consumers, claiming that they are also "ultimate consumers." We consider this a mere play on words and reject it out of hand. Electricity consumers are not end-users of gas.

Petitioners cite no case, and we know of none that holds that the Commission, in assigning priorities to a pipeline's direct and indirect customers, must identify who will ultimately bear the cost of higher priced alternate fuels that must be burned when gas is curtailed, and decide that such party should be made to bear such cost. Were we to so hold, the Commission would not only have to consider the impact of its curtailment plan on consumers of electricity, it would also have to consider the impact of its plan on the customers of every end-user, those who would have to switch to alternate fuels and those who would not.[14] The difficulty of adequately considering the impact on all of these customers, we believe, is manifest. Therefore, we decline to impose this burden on the Commission.

### V.

■ Petitioners next argue that the Commission improperly imposed on the boil-

---

14. This information would be necessary for the Commission to compare the plan's impact on the customers of end-users, and draw the plan accordingly.

er fuel users the burden of proving that they should be given the same priority as non-boiler fuel users. Petitioners base this argument solely upon the following language in the Commission's opinion that modified the ALJ's proposed curtailment plan:

[The ALJ's] decision, by not treating boiler fuel as an inferior end-use, has deviated from a standing statement of Commission policy [Order No. 467] . . . . While there is no binding legal force to a statement of policy, in circumstances where a policy has not been followed, the Commission will closely scrutinize the facts to assure itself that there is adequate support for the deviation.

On the basis of our independent review of the evidence, we conclude that the initial decision's recommendation against boiler fuel subordination should be reversed.

Joint Appendix at 575.

This language does not indicate that the Commission imposes a burden of proof on boiler fuel users. Rather, this language indicates two things: first, the Commission prefers end-use curtailment plans that subordinate boiler fuel users to non-boiler fuel users; second, the Commission will closely scrutinize any plan that provides otherwise. Thus, when the plan submitted to it fails to subordinate boiler fuel users the Commission will examine the evidence in the record closely to determine if the plan, and the treatment of boiler fuel users, is supported by that evidence and, moreover, is just and reasonable. We cannot fault such scrutiny; in fact, we commend it.

## VI.

■ Petitioners' fifth argument is that the Commission decided to subordinate boiler fuel users to non-boiler fuel users based on four findings of fact that were not supported by substantial evidence: (1) boiler fuel users can convert to alternate fuels more cheaply than non-boiler fuel users; (2) boiler fuel users can switch from gas to alternate fuels more easily than non-boiler fuel users; (3) non-boiler fuel users experi-ence greater operating problems than boiler fuel users when using alternate fuels; and (4) boiler fuel users can control pollution problems when burning alternate fuels more cheaply than non-boiler fuel users.

■ Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consolo v. Federal Maritime Commission,* 383 U.S. 607, 620, 86 S.Ct. 1018, 1026, 16 L.Ed.2d 131 (1966) (quoting *Consolidated Edison Co. of New York v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 217, 83 L.Ed. 126 (1938)). It is "something less than the weight of the evidence, and the possibility of drawing two inconsistent conclusions from the evidence does not prevent an administrative agency's finding from being supported by substantial evidence." *Id.* In deciding whether a particular finding is supported by substantial evidence, a reviewing court must take into account any evidence that militates against the finding. *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). If the hearing examiner's decision is contrary to the agency, a reviewing court must also consider the reasons that support his finding. *Id.; Air Products & Chemicals, Inc. v. FERC,* 650 F.2d 687, 696 (5th Cir. 1981). With these principles in mind, we have examined the challenged findings of fact and determined that they are supported by substantial evidence. Although there is countervailing evidence in the record and the ALJ made contrary findings, we hold that the record nonetheless contains adequate evidence to support the Commission's findings. This evidence is as follows.

(1) Boiler fuel users can convert to alternate fuels more cheaply than non-boiler fuel users.

The Commission based this finding on the testimony of several witnesses. George Dornbusch, a FERC staff engineer, testified that

Boilers can raise steam by burning inferior kinds and grades of fuel such as coal, bark, wood waste, refuse, crop wastes, crude oil and residual oil. These kinds of

fuels are more readily burned in boilers because boilers have much larger furnace volumes compared to most other types of industrial equipment. Most industrial non-boiler fuel burning equipment would require extensive redesign and retrofit or even replacement in order to achieve acceptable product quality with similar fuels.

Joint Appendix at 189. James R. Lowe, vice president and general manager of Central Florida Gas Corporation, a public utility serving the Winter Haven, Florida area, testified that boiler fuel users are typically large users and therefore can more economically convert to cheaper alternate fuels than the typical smaller, non-boiler fuel user.

This occurs for several reasons: In the first place, the very large industrial users can enter into favorable contracts for bulk purchase of fuel oils; secondly, the very large user can generally use a low grade of fuel oil such as Bunker C which carries a lower price tag; third, the very large bulk user is more likely to be located where it has direct access either to water transportation by tankers or barges, or to rail transportation. Smaller users must pay higher prices for small volume purchases; frequently can only use high priced No. 2 fuel oil, diesel oil, or propane; and generally have to resort to expensive over-the-road motor vehicle transportation to get alternate supplies of fuel.

*Id.* at 38. Finally, Dr. Carl Swanson, an economist and engineer testifying for several non-boiler fuel users, provided several examples that indicated that for "some industrial users of natural gas, the cost of conversion to alternate fuels would be likely to be higher than the conversion to boiler fuel application." *Id.* at 63.

These expert opinions are clearly sufficient to support a finding that boiler fuel users can convert to alternate fuels more cheaply than non-boiler fuel users. Therefore, we uphold this finding as supported by substantial evidence.

(2) Boiler fuel users can switch from gas to alternate fuels more easily than non-boiler fuel users.

This finding is also supported by expert testimony in the record. W.J. Smith, vice president of Florida Gas, stated that boiler fuel users can switch to alternate fuels more easily than non-boiler fuel users because boiler fuel operators, whose daily task is to change one form of energy into another, are more experienced in making such switches. Joint Appendix at 30. Mr. Dornbusch stated that

Although some older boilers may require the manual insertion of oil burners to switch from gas to another fuel, most can be switched by the manipulation of switches or valves. On boilers manufactured in the last ten years this can even be done from a remote control panel. With the exception of boilers, however, most kinds of industrial equipment have numerous burners or zones of burners that must be manually adjusted for the proper fuel input and fuel-air ratio. This operation can take considerable time and may involve a risk of damaging the product or equipment since proper temperature, flame characteristics, and furnace atmosphere must be maintained while the switch from gas to another fuel is being made.

Joint Appendix at 188–89.

These statements constitute substantial evidence to support the finding that boiler fuel users can switch from gas to alternate fuels more easily than non-boiler users. Therefore, we uphold this finding.

(3) Non-boiler fuel users experience greater operating problems than boiler fuel users when using alternate fuels.

There is also ample evidence to support this finding. Dr. Swanson testified that several phosphate companies that are non-boiler fuel users incur production losses, corrosion problems, and greater maintenance costs when burning alternate fuels. Joint Appendix at 48–49. Dr. Swanson further testified that a glass manufacturer, also a non-boiler fuel user, incurs similar operating problems when operating on alternate fuels. *Id.* at 54–56. Otto Huner-

wadel, a chemical engineer, testified that an ammonia manufacturer, another non-boiler fuel user, required precise heat control in its manufacturing process and that attaining this precision when using alternate fuels was very difficult. *Id.* at 127. He further stated that when the glass manufacturer did use alternate fuels, it substantially shortened the operating life of certain machines. *Id.* at 147. Robert Oldendorph, an engineer with Abitibi Corporation, testified that a hardboard manufacturer, a non-boiler fuel user, incurs various problems when using alternate fuels, including

> product contamination; increased difficulty with plant operations due to chemical reactions of the sulfur in the fuel with water and other chemicals present in the plant; carbon buildup inside the dryer viewing ports which makes it impossible to anticipate dryer "jamming" which causes production stoppages for extended periods; and, a possible and if-verified [sic] critical correlation between the use of the alternate dryer fuel and an increased number of dryer fires.

*Id.* at 336.

These expert opinions constitute substantial evidence. Therefore, we also uphold this finding.

(4) Boiler fuel users can control pollution problems when burning alternate fuels more cheaply than non-boilers.

Several expert witnesses also testified on this fact issue. Mr. Smith testified that "boiler plants generally, particularly industrial and steam electric generating boiler plants are generally outside of the closely populated areas within a town. They can meet the air pollution requirements due to that location on a better basis." Joint Appendix at 11. Mr. Dornbusch testified that it is easier to control emissions from boilers than non-boilers because

> [a] boiler has one large smoke stack, whereas, other industrial fuel burning equipment usually has several vents or stacks. Obviously, one large system of pollution control equipment is easier to install and maintain than several smaller systems. Furthermore, stack gas temper-

atures are often considerably higher in non-boiler fuel burning equipment. Higher stack gas temperatures require emission control systems of more complex design and operation.

*Id.* at 189. Mr. Hunerwadel stated that boiler fuel users can control pollution more cheaply than non-boiler fuel users because they enjoy certain economies of scale.

> Industrial boilers, such as electrical generation boilers, tend to be very large. For example, I understand that the electrical generation boilers served off the Florida Gas system range in size from units consuming about 18,000 therms per day (which are probably used almost exclusively for peaking purposes) to about 270,000 therms per day (which are generally used for base load purposes). If you measure the cost of pollution control equipment, it will obviously be far lower per production unit for the large user. Thus, the capital cost per unit of fuel consumed will be lower, and the capital cost per unit of steam for the larger boilers will be lower than the capital cost per unit of steam will be for the smaller boilers and industrial users. This difference justifies the differentiation by size of installation which Florida Gas has incorporated within Priorities 4, 5, 6, 7, and 8 of its proposed plan.

*Id.* at 127.

These expert opinions constitute substantial evidence to support the Commission's finding that boiler fuel users can control pollution problems when burning alternate fuels more cheaply than non-boiler fuel users.

## VII.

■ Petitioners' final argument is that the Commission lacked authority to implement an interim curtailment plan without complying with NEPA's environmental requirements. Section 102(a)(c) of NEPA requires a federal agency to prepare, to the fullest extent possible, an environmental impact statement (EIS) prior to undertaking a federal action that significantly af-

fects the environment.[15] The Commission failed to complete an EIS prior to implementing the interim curtailment plan in this case; therefore, according to petitioners, we must enjoin implementation of the plan until the environmental review is completed.

It is not disputed that the implementation of a curtailment plan is a federal action significantly affecting the environment; therefore, the question here is whether the Commission complied with NEPA's EIS requirement "to the fullest extent possible." Petitioners contend that the Commission did not, that it should have completed an EIS before implementing the interim plan. We disagree.

A federal agency need not comply with NEPA's requirement when to do so would preclude the agency from carrying out its statutory purpose. *Flint Ridge Development Co. v. Scenic Rivers Association,* 426 U.S. 776, 778, 96 S.Ct. 2430, 2438, 49 L.Ed.2d 205 (1976); *Texas Committee on Natural Resources v. Bergland,* 573 F.2d 201, 206 (5th Cir.), *cert. denied,* 439 U.S. 966, 99 S.Ct. 455, 58 L.Ed.2d 425 (1978); *Louisiana Power & Light Co. v. FPC,* 557 F.2d 1122, 1125 (5th Cir.1977); *Atlanta Gas Light Co. v. FPC,* 476 F.2d 142, 150 (5th Cir.1973). The dispositive question, therefore, is whether the Commission had a duty to implement an interim curtailment plan in this case, and if so, whether that duty irreconcilably conflicted with the Commission's duties under NEPA. The Commission concluded that it had a duty to implement without delay a curtailment plan for Florida Gas' pipeline. The Commission's conclusion is fully supported by the record, and we will not disturb it. Nor will we disturb the Commission's conclusion that it was not possible to complete an EIS before implementing the new curtailment plan.

The problem presented by the Commission's need to implement a curtailment plan

before it can comply fully with NEPA's requirements has been presented and resolved in prior Fifth Circuit cases. *See Louisiana Power & Light Co. v. FPC,* 557 F.2d 1122 (5th Cir.1977); *Atlanta Gas Light Co. v. FPC,* 476 F.2d 142 (5th Cir.1973). In both of these cases, the court excused the FPC's failure to file an EIS prior to implementing an interim curtailment plan because to do otherwise would have required the FPC to breach its duties under the NGA.

In *Louisiana Power & Light,* for example, the FPC found the existing curtailment plan unlawful and ordered hearings for the formulation of a new curtailment plan. It also ordered that an interim plan be implemented immediately, without the preparation of an EIS. Louisiana Power and Light Company objected to this procedure, contending that NEPA required the FPC to complete an EIS before imposing any curtailment plan, whether interim or permanent. The Fifth Circuit disagreed, however, holding that "the Commission need not file an EIS in connection with a curtailment plan that is truly 'interim' in nature, designed and promulgated to meet the exigencies presented by the diminishing natural gas supply. [T]o require the Commission's compliance with NEPA would be to require the Commission's abrogation of its duties under the Natural Gas Act." 557 F.2d at 1125. The court further held that as long as (1) the FPC implemented the interim curtailment plan to protect the public interest until a permanent curtailment plan could be completed, (2) preparation of an EIS would delay the hearings on the permanent plan, and (3) the FPC was attempting to proceed with the hearings as rapidly as possible, the FPC could implement an interim curtailment plan without complying with NEPA. *Id.* at 1126.

*Louisiana Power & Light* controls the decision in this case.[16] Here, the Commis-

---

**15.** See note 8 *supra.* The federal agencies can then use the EIS to adjust their actions to minimize any harmful environmental effects.

**16.** Cases that the Court of Appeals for the Fifth Circuit decided prior to October 1, 1981, are

precedent in this circuit. *Bonner v. City of*

sion found the original curtailment plan unlawful and ordered hearings on the formulation of a new plan. During these hearings, the Commission found that it could not complete the environmental review before further gas curtailments would be necessary. Because it did not want to curtail according to a plan previously held unlawful, the Commission ordered the implementation of an interim plan pending completion of the EIS.[17]

In so doing, the Commission acted properly. It could not allow Florida Gas to operate under the original plan because it was discriminatory; nor could it allow Florida Gas to operate without any curtailment plan. Therefore, the Commission had to implement a new curtailment plan. By qualifying this plan as interim and proceeding with the EIS on the permanent plan, the Commission complied with its duties under the NGA and NEPA to the fullest extent possible. Therefore, we reject petitioners' final argument.

AFFIRMED.

Prichard, 661 F.2d 1206 (11th Cir.1981) (en banc).

17. Petitioners correctly argue that an agency that seeks to excuse its non-compliance with NEPA must make explicit findings which demonstrate the "statutory conflict" which prohibits compliance. *See American Smelting & Refining Co. v. FPC*, 494 F.2d 925, 948 (D.C.Cir.), *cert. denied*, 419 U.S. 882, 95 S.Ct. 148, 42

L.Ed.2d 122 (1974). They fail to recognize, however, that the ALJ made this finding, in which he expressly noted his reliance on *Louisiana Power and Light*. *See* Joint Appendix at 532–33. On review, FERC adopted this reasoning, stating "[w]here not otherwise indicated, the [ALJ's] decision will be affirmed." *Id.* at 562.